Ada G. JOHNSTON, Individually, and as Administratrix of the Estate of Earl E. Johnston, Deceased, Plaintiff,

v.

The UNITED STATES of America, et al., Defendants.

Barbara J. WOMACK and Loyd B. Womack, Plaintiffs,

v.

The UNITED STATES of America, et al., Defendants.

Estella I. VESSELS, Individually, and as Executrix of the Estate of Don C. Vessels, Deceased, Plaintiff,

v.

The UNITED STATES of America, et al., Defendants.

Lila M. MEWHINNEY and Richard M. Mewhinney, Plaintiffs,

v.

The UNITED STATES of America, et al., Defendants.

Nos. 81–1060, 81–1061, 82–1537, 81–1100, 82–1539, 81–1101 and 82–1538.

United States District Court, D. Kansas.

Nov. 15, 1984.

See also, D.C., 568 F.Supp. 351.

Ken M. Peterson, Dennis Feeney, Morris, Laing, Evans, Brock & Kennedy, Christopher W. O'Brien, Redmond, Redmond, O'Brien & Nazar, Wichita, Kan., for plaintiff.

Donald E. Jose, Asst. Director, Pamela L. Wood, Ralph H. Johnson, Trial Attys., Carl N. Kelly, Special Trial Atty., Torts Branch-Civil Div., U.S. Dept. of Justice, Washington, D.C., Steve Lester, Asst. U.S. Atty., Wichita, Kan., for defendants.

## MEMORANDUM AND DECISION

PATRICK F. KELLY, District Judge.

These consolidated lawsuits have been fully tried before the Court pursuant to 28 U.S.C. § 1346(b) (1976), and the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680

(1976). Venue of the action is proper pursuant to 28 U.S.C. § 1402(b) (1976).

Simply said, the cases concern the claims of four employees of Aircraft Instrument and Development, Inc. (AID), of Wichita, Kansas, who personally, or through their representatives, contend that their respective cancers and resultant damages were caused by exposure to minute quantums of ionizing radiation [1] that originated from luminous dials and instrument parts sent to the AID Plant. The United States, being the primary supplier of these products, is the sole remaining defendant.

Essentially, this case deals with the science of health physics [2] and the ramifications, if any, of exposure to ionizing radiation. The litigants offered the testimony of 53 witnesses, including that of some of the most eminent persons in the field. Massive documents from both sides were offered. The testimony of each witness has been carefully digested with perceptions of demeanor and expertise noted. Each of the exhibits has been carefully reviewed and studied. The Court's detailed trial notes and much of the transcript (5,409 pages) have been reviewed and reread. Counsel have provided the Court with suggested findings of fact and conclusions of law and have fully argued their causes.

This decision is intended to address and detail as fully and succinctly as possible the factual and legal reasons why the plaintiffs cannot recover in this suit.

I. *Introduction of the Parties; Some History of the Litigation; and a Brief Resume of the Respective Claims and Defenses*

The estate of Earl E. Johnston claims damages for his wrongful death and conscious pain and suffering in that his exposure caused leukemia; the estate of Don C. Vessels similarly claims damages as a con-

---

1. As may be compared to the claims in *Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908 (10th Cir.1981), rev'd —— U.S. ——, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), i.e., plutonium; more recently, *Allen, et al. v. United States*, 588 F.Supp. 247 (D.Utah 1984), i.e., an atomic blast and 200 rad alpha exposure.

2. Defined here as the protection of people and the environment from the harmful effects of ionizing radiation, i.e., radiation protection; one is certified in this field by the American Board of Health Physics.

sequence of his lung cancer; Barbara J. Womack claims damages for pain and suffering, for a shortened life expectancy, and for related damages as a consequence of her thyroid cancer. She additionally claims damages for mental suffering from an expectancy of future cancers. Loyd B. Womack, husband of Barbara Womack, claims a loss of consortium and mental suffering from an expectancy of cancer; Lila M. Mewhinney and her husband, Richard, similarly claim damages as a consequence of her colon cancer. Plaintiffs Womack and Mewhinney have claimed damages for an expectancy of cancer in their children. It appears that these children had from time to time visited the AID facility and been exposed. These claims were stricken by the Court in its order dated February 24, 1984.

The detailed history of each person's involvement, as to time and extent of alleged exposure and the ramifications of their respective claims, are hereinafter discussed.

From the outset, each has urged that radium–226, a radioisotope which produces ionized radiation, is ultrahazardous per se and inherently dangerous, as it is destructively powerful. They urge here, by example, that should radium-226 be inhaled and ingested into the human body, it gives off alpha particles that alter a cell formation and start the cancer process. Detailed ramifications of radium-226, radon gas, daughter products, etc., are also hereinafter defined and discussed. Plaintiffs claim that since there is no known safe threshold from such exposure, the United States was required to adequately warn of the dangerous properties by clearly labeling each radium-painted instrument, which instruments were then distributed into surplus markets.

The plaintiffs further contend that through the recent years, the United States has released massive quantities of unmarked radioactive aircraft instrument parts into the surplus market; that while stored and used at such places as the plaintiffs' employer's plant, AID, these parts accumulated in storage areas and about the employees' work area, during which time the ionized radiation was permitted to build up to dangerous quantums, giving rise to injury.

Shortly prior to this trial, these cases were also pending against numerous manufacturers and suppliers of these products, who, in turn, directly or indirectly, distributed the products, including those from the United States. This is mentioned here inasmuch as a goodly number of different types of instruments have been discussed, and for the following reasons: The plaintiffs have always maintained, in part, that the United States' liability is absolute, following *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868). The Court ruled prior to trial (Memorandum and Order Feb. 24, 1984) that as it would appear that radium compounds and one's exposure to such compounds are highly dangerous, then in such an event, the doctrine probably should be considered. The Court alternatively suggested a remedy under the concepts embodied in the Restatement (Second) of Torts § 519 (1979). A decision on these issues, however, was reserved pending receipt of the evidence. Coinciding with this theory, if applicable, however, was the Court's additional finding that inasmuch as the plaintiffs' claim asserts a fault concept at the hands of others, it should as a consequence be weighed pursuant to the comparative fault principles of Kansas (K.S.A. 60–258a). Thus, in the course of these cases, the respective comparative fault has been jointly considered. In this regard, the Court has heard the evidence as it may apply to the plaintiffs' employer; perhaps the State of Kansas, whose duty it was to regulate, monitor and/or inspect the premises; and the plaintiffs' acts themselves. In other words, each have been weighed consistent with the law of Kansas. For reasons shown, all of this has been an unnecessary exercise.

For the most part, these cases, considered alternatively as negligence actions, test the traditional duties, if any, of the United States. They suggest that the product is highly dangerous, and that the

United States has a high standard of care and is required to warn ultimate users such as the plaintiffs of the consequence or dangerous propensity of radiation exposure; that failure here has caused or contributed to the plaintiffs' injuries.

The United States has adamantly denied any liability to these plaintiffs for sundry reasons. Some of their defenses have been previously addressed, including those of the statute of limitations and the propriety of filing of the plaintiffs' claims (Memorandum and Order Jan. 12, 1984). It is first contended that the United States is immune by reason of the discretionary clause found in 28 U.S.C. § 2680(a), and as a consequence this Court has no jurisdiction. Again, prior to trial, the Court took this issue under advisement awaiting some developments in the evidence. When the plaintiffs rested their cases, the Court ruled that the government's decision to use and/or ultimately dispose of these instruments was indeed a discretionary function and no liability will flow from that decision. This issue is additionally addressed herein. As to immunities, if any, for the government's alleged failure to label or warn of the propensities of the products, the Court, sensitive to the Tenth Circuit's rationale in *Miller v. United States,* 710 F.2d 656 (1983), again took that issue under advisement. The Court, in this decision has also fully addressed its views and findings.

Next, and what develops to be the central issue in these cases, is the United States' insistence, that while there may not, as yet, be a scientifically established threshold of exposure from which these cancers could arise from exposure to ionized radiation, that nevertheless all of the scientific studies, tests, and experiments known to the health physics community suggest that there are no epidemiological studies or findings to support an occurrence of cancer from exposure at less than 50 rad. There probably is, at least, a safe

or practical threshold from exposure at about five rem per year, as a maximum permissible low dose (LET). A rem is a unit for measuring a dose of radiation received by an individual.[3] Even in this event, the kinds of cancers claimed by the plaintiffs would not occur. They have claimed here, under the circumstances shown, the plaintiffs' exposure from the instruments is so minute that each would have to literally eat the paint, and even then only incur the unfortunate result of bone sarcoma or cancer of the paranasal sinuses. Admittedly, as these cases commenced, this Court, a layman in the truest sense, impressed with representations of the plaintiffs' counsel from the outset, received the government's claims with some skepticism. Indeed, the government's counsel was chided from time to time, as these claims were then thought to border on the facetious.

To give some contrasting perspective, which in great measure directs the course of the Court's findings and reasonings, it is recalled in the course of a previous hearing that the shipment of the parts identified for testing was to have been delivered from plaintiffs' counsel to one of the defendant counsel's office. The plaintiffs' counsel understandably exercised his concern as to the safety of his colleague and wanted to assure care in the delivery of these parts to counsel. Defendant's counsel was not the least bit interested, but as a layman this judge most certainly was! Now, in the course of trial, an aircraft instrument coated with radium paint was placed on the Court's exhibit stand. Again, plaintiffs' counsel exclaimed some concern as to our safety. As of then, the Court had digested the teachings from a superb witness, Dr. John Auxier, and reasonably appreciated the quantums of radiation, i.e., 3.5 microcurie, which each instrument would emit. A microcurie represents $1/1{,}000{,}000$ of

---

**3.** A rad is defined as a basic unit of radiation dose based upon the amount of energy absorbed in a given mass of tissue.

A rem is defined as a unit of radiation dose which takes into account the differing biological effectiveness of different types of radiation. For example, 100 rem of any type of radiation should produce the same biologic effect. Rads times effectiveness factors equal rems.

a curie. Additionally, the Court had come to understand alpha emissions, which under the circumstance were harmless. In every event, on this occasion the Court was not so concerned, because as this decision attempts to show, such a notion, standing alone, is nonsense!

Lastly, the government denies the factual foundation on which plaintiffs' cases are premised.

## II. *The Plaintiffs' Case*

The plaintiffs' cases describe a state of circumstances, much of which is entirely circumstantial. Since exposure to Mrs. Womack is alleged to have commenced as early as 1967, it is necessary to establish the environmental basis as of that time. There is, of course, no hard data to support this, and as a consequence we commence the cases with comparative studies. In 1968 the Bureau of Radiological Health carried out a national program designed to reduce the exposure of man to hazardous ionizing and non-ionizing radiation. Radium luminous dials had been used since 1919 in military aircraft, particularly during World War II and immediately thereafter. Many of those instruments, declared surplus by the United States Department of Defense, were being utilized by private industry for repair parts and original installation in light aircraft. Significant contamination had been observed in these facilities as they disassembled and repaired the instruments.

Inasmuch as over 75% of the light aircraft produced in the United States are fabricated in Wichita, a total of 15 companies participated in a study. The findings of these studies are referred to as the Geiger-Schmidt Studies. (Ex. 9538 & 12,-190). These studies may have included AID. They did include Air Capitol Dial (ACD), which is referred to here as Plant C, an apparent comparable shop. Those findings are used as a basis of comparison from which the plaintiffs premise their foundation. Included in these findings is the fact that, on an average, approximately five percent of the instruments are considered as radioactive. The millirem (mrem) level, being $\frac{1}{1,000}$ of a rem, averages less than 2 mrem.[4] The two employees in the study shown to have been exposed to radiation reflected a finding in their body burdens, being a showing of radium residue in the bone. Simply said, the plaintiffs claim that if Plant C was bad then, the AID Plant was always in a worse condition. The plaintiffs also have the findings taken from time to time by representatives of the State of Kansas, Bureau of Radiation Control, as they have regularly and/or routinely monitored the AID Plant. (Ex. 12,280). A review of Exhibit 19,197, the state's entire file, suggests that the conclusions drawn by these representatives did not present a health hazard, but rather the presence of excessive quantums of alpha contaminants. At the outset of this case, this struck the Court as a "distinction without a difference."

Through the years, AID's management has left much to be desired. While a state-licensed entity and operating pursuant to certain radiation protection regulations (Ex. 9363), the employees have removed or stripped radiated paint from the products without license or authority. The employers have attempted to conceal their operations from the state and perhaps their employees, and they have deserved strict sanctions and forfeitures from time to time.

In February 1981, on representation of plaintiffs' counsel, and with accompanying affidavits, this Court authorized an unannounced inspection of AID by the plaintiffs' group, including Mr. Robert Gallaghar, an applied health physicist, and Dr. Carl Johnson, a medical health physician. This rather dramatic process is referred to as the "Raid on AID." To no one's surprise, the results of this inspection were remarkable—the place "reeks" with radiation. Admittedly, if asked as of then, the

---

**4.** This conclusion is made from findings, including the graphs shown at page 11 of Exhibit 12,190.

Court, per Rule 65, would probably have temporarily enjoined that operation, ordered a cleanup, and recalled all radioactive products. As often develops, following a full hearing such as that which has transpired here, the Court, however embarrassed, would have set the order aside! In every event, and while detailed more fully herein, the Gallaghar findings (Ex. 9595) become of paramount interest to the plaintiffs' experts for the benefit of their ultimate opinions. The Geiger counter readings revealed certain alpha and/or beta gamma content. Mr. Gallaghar's film badge [5] revealed levels of 80 mrem per 14 hours, or approximately 6 mrem per hour. These findings were significant. An audioradiograph, simply an x-ray process, taken of certain air filters, was positive. (Ex. 9621). Again, this is suggested to be of significance.

Since the raid on AID, additional state inspections and an OSHA inspection revealing findings of external alpha contaminations, the plant has been cleaned up by AID's present management. Again, plaintiffs logically argue that if the circumstances are bad now, they were most assuredly worse then.

The plaintiffs' first witness and one of their principal experts was Dr. Karl Z. Morgan. This person is presented as a most eminent scientist. Indeed, without further resume, one would easily conclude that he has literally founded the science of health physics. The Court has been reminded, more than a few times, that he and his colleague, Dr. Gofman, come here as the "heroes" of the *Silkwood* litigation and others. In days past, having dealt with his proffered findings in the course of several hearings and dispositive motions by the government and others, and given appropriate credence to the same, all were overruled. Understandably, this witness was received with anticipation and interest.

The witness's testimony is quite lengthy (500-plus pages), and for the purpose of these findings, the Court will not attempt to resume all of it. Rather, the Court will attempt to recite that which is considered of importance with regard to his opinions.

During Dr. Morgan's early periods, he prepared a paper on procedures to calculate permissible exposure and tolerance levels with regard to the risk of exposure. He has developed the mathematics for calculating this exposure. The witness has discussed formulas and procedures to analyze dosage. (Ex. 12,381). It is his thesis and conclusion that an overwhelming amount of data has been accumulated to show that there is no safe level of exposure. Now, it is not in issue in these cases that an excessive or large amount of radiation creates an increase in the naturally occurring rate of cancer. The National Cancer Institute would suggest that 16% of 100 people will die from naturally occurring cancers. Thus, if 100 people have been irradiated with a large amount of radiation, the increase might be that of 16 to 20 naturally occurring cancers, to a total of perhaps 25 cases, or an excess of five. The witness claims that causation may only be adduced by statistical analysis. Dr. Morgan is clear that he does not hold himself out to be a medically trained person, yet their expertise is not in the field of how much dose will cause a cancer. A physician's expertise is in analyzing cancers and their origin. Dr. Morgan's expertise is in what dose will cause a certain form of cancer. He has taken the data on what he calls the "dose coefficient," that is, the number of cancers per person rem in the numerator, divided by the same factor, plus the natural incidence of cancer. (T.Tr., Vol. 1, p. 146).

With this understood, the witness reviews his superlinear chart (Ex. 19,008), which suggests that he can extrapolate from these known high doses to extremely low doses to confirm his view. The witness has lectured the Court on the alteration of cell formation and the difference in humans by reason of age and metabolic conditions. He has established that ionization can provide enough damage to divide the cell and initiate a malignancy. He attributes most

---

**5.** A device used to measure cumulative external exposure to radiation, i.e., a personal dosimeter.

of the problems to the existence of radon gas (R222), as it builds up from the source of emission. (T.Tr. Vol. I, p. 176). He concludes that 97.6% of the plaintiffs' exposure and injury is a result of this event. It is his thesis that while alpha particles create no problem to man, once inside the tissue they do create a problem. He suggests, by example, that once in the colon alpha rays will bombard the tissue in millicuries per second, and he tenders his publication in the Encyclopedia Brittanica (Ex. 13,299) to support the claim. He identifies beta particles as fast-moving electrons which, in turn, give off daughter products and penetrate human cells, such as the thyroid. These rays throw off approximately 37,000 beta particles per second per microcurie. He tenders numerous articles, many of his own, to support his thesis. Additionally, radon gas gives off gamma rays. These will penetrate the human body and alter cell formation, i.e., external gamma.

While, as indicated, there is more to his testimony than capsuled here, it suffices that the witness expressed his opinion in these cases. He is asked to assume as true all that is resumed above, including the Geiger findings and those reported by Gallaghar. Additionally, he is asked to assume that we deal here with an approximate 49,000 instruments (Ex. 12,477), of which 50% are radioactive (Ex. 8067). He has measured seven of the 10 instruments selected by Gallaghar and established that each emits approximately 26.7 microcurie. Inasmuch as ventilation and space are of interest, he has received an air study (Walker Report) of the AID facility, and as contrasted with Plant C (Ex. 12,366–67). These findings suggest an average air exchange at AID of one per day. This finding is necessary for the witness' ultimate conclusions regarding the buildup of radon gas from the instruments, which he has established at 14 mrem per hour, by average, but constant, throughout the plant, over an approximate 15 years.[6] Without objection, the witness concludes that each of the plaintiffs' cancers are derived from this exposure. He further postulates that each would, or will likely, incur additional cancers. (Ex. 12,382A). The assumptions underlying his conclusions are contained in his voluminous report (Ex. 9595), which is handed up without comment or further explanation.

Dr. Morgan's conclusions were enthusiastically endorsed by the next witness, Dr. John Gofman. This gentleman is readily perceived as a most intelligent, persuasive, and articulate spokesman for the plaintiffs' cause. Indeed, he is an alarmist, truly, obsessed with the righteousness of his long espoused concerns regarding exposure to radiation in any setting. The witness is quite clear: the United States' positions are "rubbish." While he professes a sense of hesitancy for having taken up these cases, it is clear from the outset that this man enjoys the "limelight" (see also, his report, Ex. 18,954), and is no stranger to the courtroom.

The witness enjoys professor emeritus status at the University of California at

6. This finding is made in that the witness has traced Mrs. Womack's circumstance within the plant since 1967 through 1981. It follows that the same findings should apply to each plaintiff.

Additionally encompassed within the proffer of exhibits are 12,280 (summary of data contained in the State of Kansas file, i.e., Bureau of Radiation Control), 12,281 (summary of data in Air Capitol Dial Plant), 12,263 (summary of exposure data regarding plaintiffs), 12,287 (summary of exposure regarding plaintiff Vessels), 12,228 (summary of exposure of plaintiff Johnston), 12,289 (summary of exposure of plaintiff Mewhinney), 12,290 (summary of exposure of plaintiff Womack), 12,270A and 12,295 (certain medical diagnoses), 12,173 (certain film badge data), 12,181 (film badge data of the AID Plant gathered from 1980 through 1982), 12,184 (whole body count summaries from Helgerson Report), 9598–9631 (audioradiographs), 12,207 (preliminary report of Dr. Johnson), 10,770 (letter report of OSHA), 12,186 (reports of treating physicians, i.e., Dr. Moore on Johnston and Vessels, Dr. Padgett on Mewhinney, Dr. Regier on Womack, and Dr. Wood on Vessels), 9560 (volume of pictures within a box of literature), 12,178 (series of three government documents relating to aircraft instruments), 12,193 (scientific article commenting at p. 191 on amount of radium in the instruments), 12,188 (article entitled "Radium in Military Surplus Commodities").

Berkeley, the Department of Biophysics and Medical Physics. He has worked with Dr. Glenn Seborg, who received the Nobel Prize for work on plutonium. The witness took on a study of a substance known as Element 91 and was able to prove the existence of Element 91, which was later to become uranium-233. He claims credit with having discovered it in collaboration with Dr. Seborg. He has degrees in nuclear physical chemistry; he has taught courses in dose and dose calculations; he has calculated hypothetical processes with regard to the separation of plutonium and drops J. Oppenheimer's name, who organized the Los Alamos laboratory to produce the atomic bomb. The witness uses the word "we" quite liberally. He claims the patent for the discovery of fissionability of uranium-233, and was the first to separate a milligram quantity of plutonium. After World War II, he returned to medical school. His training is in the field of internal medicine, and he treated cancer and leukemia victims at the outpatient clinic and as a resident. He became an assistant professor of medical physics at Berkeley. He then worked at the Donner Laboratory, which is funded from the Atomic Energy Commission, Division of Biology and Medicine. He then took up under Dr. Ernest Lawrence, who invented the cyclotron, and he represented him in his concern for radiation safety. He became the first director of the Livermore Laboratory and the Department of Health Physics and Health Chemistry, which did the measurements of the radiation safety. He returned to the Donner Laboratory in 1957, and back to Livermore in 1962, principally in light of recent atomic weapon tests in Nevada. He has been honored by the Livermore Laboratory and makes some point of this inasmuch as he is apparently now in controversy with them. Presently he is associated with no one and beholden to no one. His book, *Radiation and Human Health*, published by Sierra Book Club in 1981, has been introduced.

In 1969, the witness claims that while working for the United States he made discoveries of a world nature in the field of ionized radiation. First, he suggests that the risk of cancer from ionized radiation was 1 to 10 times worse than anyone had thought, and second, there were three generalizations that could be made. These principles are called the laws of cancer induction by radiation. The first is essentially that all human cancers can be adduced by ionizing radiation; second, that a given amount of radiation increases by a certain percentage the number of cancers over what would have occurred anyway, i.e., if a certain cancer has a 100 cases occurring per year in a certain group, a given amount of radiation would increase that spontaneous cancer by 10%. This is called the relative risk method, and he was the one who assisted in the development of it. Third, children are much more sensitive than adults with respect to radiation-produced cancers. (T.Tr. Vol. 6, p. 542).

He has found, and in days past has stated on behalf of the United States, that there is no safe threshold. Most clearly, they have seen no evidence of a safe threshold.

He suggests that these cases present a new law for him, in that one must consider the particles of radiation; in other words, one for radiation like alpha as opposed to cancers from gamma radiation, i.e., a much shorter span for alpha and later for gamma. This is called high cap LET ("LET" stands for linear energy transfer). Alpha particles rage through tissue, destroying as they go, and transfer much energy for every unit path, whereas gamma rays produce eons at a bigger space, and we call that low LET. The time of appearance of cancer is totally different.

The witness further lectures the Court on the effects of radiation and its cause of cancer by destruction of cells. He discusses the thesis of disruption of chromosomes, deletions, and/or translocations. He makes an interesting analysis regarding production of radon, in that radon is formed by radium regardless of the physical or chemical state of the radium at the rate of 2.1 microcurie of radon per second per gram of radium. To follow through,

the so-called gamma rays of radium arise from these two transformations among the decay products that are not emitted by radium itself. This is why radon is so hazardous, because the short-lived products which really produce the heavy gammas are not from the radium itself—they are from radon and its daughters. It would appear that in light of the United States' obstinacy as regards his claim, his outspoken criticism precipitated the formation of the Committee on the Biological Effects of Ionizing Radiation (BEIR Committee), in that as a result of communication from Senator Muskie to Robert Finch, then Secretary of HEW, the National Academy of Science appointed this committee to look into and update the general knowledge of radiation hazards.

The witness traces massive articles regarding the subject, all contained in Gofman I and II. Many of these are related to the United States' involvement in radiation, and some are geared to the United States' duty to warn of the propensities of radiation. Comments and discussions as to the latter are reserved. These exhibits additionally support the witness' thesis.

As with the resume of Dr. Morgan's testimony, the Court has not begun to trace all that has been said by this witness, but hopefully this resume suffices all that is important in reaching an opinion.

When the pertinent questions are addressed with regard to probability of injury from exposure, the United States appropriately objects. Now, in light of his medical background, and on the condition that all requisite factual material with which he will be concerned is to be adduced, the Court permitted the witness to testify.

Dr. Gofman has no opinion as to plaintiff Vessels, but is prepared to state his opinions within the range of medical probabilities as to the other parties. (T.Tr. Vol. 10, p. 859). To form his opinions, he needs the medical records. He needs measurements of radon in the air since 1967; he prefers measurements of ongoing particulate radium in the air, but he doesn't have it, and he supplants this with measurements from other facilities and hard data from British plants. He has the Gallaghar film badge measurements. Additionally, he considers the number of instruments, the size of the plant, ventilation factors, and measurements of the amount of radium in the plant. He draws upon his knowledge of the natural rate of radon escape, i.e., radon escaping into the air to provide gamma radiation. The alpha particle data is of interest to him in relation to its effect on the lungs. He has read Dr. Morgan's report and opines that a reconstructed dose of 15 mrem per hour at the AID Plant is "very reasonable." He has studied the Gallaghar report and reviewed the Kansas summaries. He accepts the Walker report on ventilation. The Geiger studies suggest that 5% of instruments are radioactive. He understands that a Mr. McKinney has also so estimated this, yet Gaughn has reported a 50% ratio of radioactive instruments in the AID Plant. Accordingly, he recalculates that 27% of the instruments are radioactive, this figure representing the difference between the two other estimates.

Essentially, the factors necessary for his opinion are that the Air Capitol Dial Plant had no more than 500 instruments when the Geiger Study was taken; 5% of Air Capitol's instruments were radioactive; the Walker comparative studies of Air Capitol and AID's air exchange rates; the total surplus instruments and the percentage of radioactive surplus instruments at AID.

On the strength of Dr. Gofman's understanding of the evidence, of course, he testifies that each plaintiff's cancer is causally related to the radiation in the plant. (T.Tr. Vol. 10, p. 899). In scrutinizing the plaintiffs' medical conditions, we exhaust the field of leukemia, i.e., chronic myelocytic (CML). We distinguish whether it is Philadelphia positive or negative—it's negative! We explore concepts of latency, classic signs and symptoms, and hematology. As to Mrs. Mewhinney, we explore the colon passage, the rectum, and whether her cancer is within the colon or rectum. Even the minute crypts of Lieberkuhn are explored as regards the passage of radiation. In-

deed, as in the fields of radiation and health physics, here in the varied field of medicine the witness's expertise seems to be without limits.

The witness prognosticates as to future cancers. (T.Tr. Vol. 10, p. 923). He calculates that the plaintiffs have received a certain dose, and this dose is calculated from a vast range of human experiences (the known or valid exposures to radiation). He discusses the cancer coefficient, which is a formula for estimating the number of people who will die of cancer as a result of certain amounts of radiation injury, and he then calculates the increased likelihood of a certain person getting a cancer than it would have been had that person not been irradiated. In other words, though not clinically diagnosed, these cancers have already occurred. The witness is convinced that these cancers can be diagnosed at this time on a microscopic level.

Dr. Carl Johnson has also expressed his opinions as to medical probabilities of causation. Lastly, other local physicians, including Dr. Dennis Moore, an oncologist and hematologist, and Dr. William Padgett, a surgeon, are called. Each are given license to assume the plaintiffs' hypothetical factual basis to be true. Dr. Moore has asserted a relationship between the exposure of Johnston, his patient, and Vessels, and their respective cancers. Dr. Padgett similarly testifies as regards Mrs. Mewhinney. Dr. Ernest Rieger, physician for Mrs. Womack, while called, has no opinion on causation.

Dr. Moore is also impressed by the fact that each of these persons has been exposed to some radiation "above background," which additionally supports his opinion.

Now the Court has synopsized the nature and extent of the plaintiffs' cases with respect to causations, if any. In other words, it is here as if to say that all of the plaintiffs' evidence was in. The record is quite clear that this Court has expressed considerable displeasure with both counsel for having permitted witness Morgan to testify as to his conclusions in response to hypothetical questions at a point at trial when there was absolutely no evidence admitted to support the factual assumptions underlying the hypothesized question. In the course of some banter, initiated by the Court, all of the foregoing was conditionally tendered. Surely, if the United States had timely objected to his testimony, these cases would probably have been over in the course of two days. As it stands, the Court has been required to patiently listen to all of the evidence, both sides, in the interest of ascertaining if, in fact, there is *any* evidence on which *any* of the foregoing witnesses are permitted to testify, and if so, to test its reliability and weight.

Before the Court addresses these and other issues, it is probably best now to articulate the scientific lessons learned in these cases from all the evidence as they apply here. It goes without saying that the Court is aware that considerable interest from the health physics scientists is focused on this case, and doubtless this decision will be the subject of some discussion within their various circles. This decision is drafted with such an event in mind, ever sensitive to the Court's own inadequacies, not only with respect to a thorough comprehension of the field of health physics, but also with respect to an ability to articulate the application of the science to the facts of these cases. For those persons the following will probably appear as a "primer".

### III. Subject Matter Introduction and Scientific Background

The Court has drawn from the findings of a collection of studies known as the BEIR Committee for the purpose of definitions and indeed for much of what is ultimately concluded by the Court as reasonably probable. This is a committee of the National Research Council that studied the biological effects of ionized radiation. The committee personnel read as a "Who's Who" from the pertinent disciplines. The document, BEIR III (Ex. 19,626), i.e., The Effects on Population of Exposure to Low Levels of Ionized Radiation: 1980, is the result of a massive study. The Court finds

the findings of the study to be entirely persuasive and relevant in these cases.

*Types of Radiation.* For the purposes of this lawsuit, there are three basic types of ionizing radiation. An alpha particle is composed of two neutrons and two protons, like the nucleus of a helium atom. (BEIR III, p. 515). A beta ray is a single electron. A gamma ray is a photon, or bundle of energy which contains some of the properties of both matter and light. None of these forms of radiation can be seen.

Compared to the other two types of radiation, an alpha particle is relatively large and heavy. It is stopped by a single sheet of paper and can only travel the distance of a few human cells inside the human body. Yet, because they are large, alpha particles can do considerable "damage" along the short track they follow. The "damage" is referred to as an ionization event, which means that an electron has been taken away from an atom inside a human cell, making that atom an ion with a positive charge. These ionized atoms may then undergo chemical reactions inside the human cell which may damage the cell. Also, an alpha particle may damage a cell by disrupting the DNA inside the human gene. Alpha particles are considered to be high LET radiation which means that they have a high linear energy transfer. That simply is a way of saying that "large" alpha particles transmit a "high" amount of energy to surrounding tissue as they travel a short (linear) distance. (BEIR III, pp. 13, 519; T.Tr. Vol. 1, pp. 23–24).

Gamma rays are very different. They are low LET radiation, meaning that they transmit low amounts of energy as they travel long distances. For example, an alpha particle will give up or transfer all of its energy in the first few dead skin cells of a human being while a gamma ray may pass through the whole human body without striking anything to which it could transmit any of its energy. More gamma rays are stopped as the rays penetrate material of higher density. For example, x-rays are essentially the same as gamma rays, and the increased density of human

bone over human soft tissue makes medical diagnostic x-rays possible. If a gamma ray does strike a human cell as it passes through the human body, it could cause the same type of "damage" as an alpha particle. An atom in a cell could be ionized or the DNA inside a gene could be disrupted. Alpha particles will cause many more ionizations than gamma rays "per unit track," i.e., over the same linear distance. Thus, alpha radiation is high LET and gamma radiation is low LET. (T.Tr. Vol. 1, pp. 38–39, 43–48).

Beta rays are actually particles like alpha rays but they are much smaller particles. They are electrons with a negative charge. Consequently, their physical properties fall between alphas and gammas although they are similar to alphas in that they are particles. They can penetrate several sheets of paper but not a book. Most beta particles will be stopped by normal clothing or by the thickness of human skin. (T.Tr. Vol. 1, pp. 48–50).

The relative power of these various types of ionizing radiation is measured in a unit called an electron volt. This is expressed as ev or MeV for a million electron volts. (BEIR III, p. 518). There are actually many different kinds of alpha particles of different energies (MeVs). The same is true for beta rays and gamma rays although these various MeVs still cluster around a certain range of values consistent with the properties of that particular type and source of ionizing radiation. Scientists generally refer to radiation of higher MeVs as more powerful radiation, or radiation of higher energy.

These three forms of ionizing radiation can harm a human cell in three different ways. If these forms of radiation strike a female egg or a male sperm, they can rearrange the DNA which could cause genetic damage to the next generation. (BEIR III, pp. 96–97; T.Tr. Vol. 40, pp. 3151–3152). Since this case involves no allegation of genetic damage, this possibility will not be discussed further. The second type of harm to a cell could be a chemical or DNA change which kills the

cell. This is an acute form of radiation damage, and if enough cells are killed it causes observable effects such as a loss of hair or nausea. At high enough doses, enough cells will be killed so that the human body cannot survive this impact. That is known as a lethal dose. Since this case does not involve the acute effects of radiation, they will not be discussed further. (BEIR III, p. 24; T.Tr. Vol. 40, p. 3151).

The third way that ionizing radiation, whether alpha, beta, or gamma, can harm a cell is to cause a chemical or DNA change that will not kill that cell, but rather cause a change that the cell passes on to its daughter cells. At some future point in time, a granddaughter cell expresses this change as a lost ability to multiply in a controlled manner. Consequently, the cell multiplies wildly until there is an accumulation or a lump large enough to observe and to diagnose as a cancer. (BEIR III, p. 25). The time from the radiation-induced change in that original cell until the cancer is diagnosed is known as the latent or latency period. (BEIR III, p. 519). A part of that latency period, from the time the granddaughter cell starts uncontrolled multiplication until the time the cancer is large enough to diagnose, is also known as the period of silent growth. (T.Tr. Vol. 63, p. 5092). The cancer is there and is growing at the same rate. It just seems silent because it cannot yet be diagnosed. The time span of this tumor growth is measured in units called doubling times. That is the time it takes for a tumor to double in three dimensional mass, not the time it takes to double in two dimensional size (diameter). (T.Tr. Vol. 63, pp. 5092–5095).

*Radium–226 and Its Daughters.* This case is really founded upon one particular element, radium–226, and its natural decay products. Radium is a naturally occurring radionuclide. It is not man-made like a radioisotope. In fact, it is the element in pitchblend which Madame Curie first identified as a radioactive material. (T.Tr. Vol. 1, p. 38). Since it is a natural element which cannot be used to make weapons or build nuclear reactors, it is not regulated by the United States under the Atomic Energy Act.

All radioactive elements spontaneously emit a type of radiation and then change into a different element. This process is termed a radioactive decay. (BEIR III, p. 516). When an element, such as radium, is followed as it emits radiation and changes from element to element until it becomes stable, one is observing what is known as a decay chain. A lump of radium will not decay and change all at once. Each atom decays in a random manner over a period of time. Science can measure the length of time necessary for one lump of radium 226 to decay into half a lump of radium–226. This period of time is known as the half-life of radium–226. A simplified decay chain for radium–226 follows:

| HALF–LIFE TIME | ELEMENT | PRIMARY EMISSION |
|---|---|---|
| 1602 yrs. | Radium–226 | |
| | ↓ | Alpha |
| 3.8 days | Radon–222 | |
| | ↓ | Alpha |
| 3 min. | Polonium–218 | |
| | ↓ | Alpha |
| 26 min. | Lead–214 | |
| | ↓ | Beta, gamma |
| 20 min. | Bismuth–214 | |
| | ↓ | Beta, gamma |
| 164 microseconds | Polonium–214 | |
| | ↓ | Alpha |
| 21 yrs. | Lead–210 | |
| | ↓ | Beta |
| 5 days | Bismuth–210 | |
| | ↓ | Beta |
| 138 days | Polonium–210 | |
| | ↓ | Alpha |
| | Lead–206 | |
| | STABLE LEAD | |

T.Tr. Vol. 47, pp. 3724–3730.

The plaintiffs have placed great emphasis on the fact that the half-life of radium is 1602 years, as if to infer that radiation is bouncing about everywhere as its consequence. This notion in part premises their thesis for a finding of absolute liability.

For purposes of this case, the 1602 year half-life means that whatever amounts of radium were placed on the instruments during World War II, essentially the same amount would still be there 20 years later when that instrument entered AID. Also, whatever amounts were measured on average instruments today would effectively reflect the amounts on the average instruments when the plaintiffs worked at AID. It would take 1602 years for half of the radium in AID to change to radon (a gas), but from what has been learned here, if AID had reasonably normal air exchanges, the radon gas would be removed about as fast as it was generated. In other words, a little ventilation would go a long way toward control of such a slow generation of radioactive gas. The decay chain shows five primary emissions of alpha particles. It is these alpha particles that constitute the primary concern of health physicists over the safe handling of radium-bearing items. Because of alpha's inability to penetrate human skin, the main concern is to keep these alphas outside of the human body where they can cause no harm. (T.Tr. Vol. 47, p. 3730). The radon in the chain is radon gas. Like radium, it is commonly found in nature. (NCRP 77, p. 13). Since it has a short half-life of 3.8 days, any radon gas which is not removed on a daily basis will quickly change into polonium-218 and then into lead-214. These three decays will all give off alpha particles. Lead-214 will change in minutes into bismuth-214, which also changes in minutes into polonium-214. These two decays of radon daughters give off beta and gamma rays. It is these betas and gammas which can cause external radiation to the whole body from this radon in the air even though none of the particles in the air actually get inside the human body. (T.Tr. Vol. 47, p. 3729). If the radon gas or these daughter products are inhaled into the lungs, their decay in the human lung can cause damage to the cells in that lung. (T.Tr. Vol. 47, p. 3734). When certain witnesses in this case referred to "harm" from a "radon cloud" at AID, they were actually referring to these betas and gammas from radon

daughters, lead-214 and bismuth-214. If a facility like AID has adequate air exchanges, a "radon cloud" will not exist and there will not be a significant dose from radon daughters in the air.

With this decay chain and the basic facts about types of radiation in mind, it can be understood that a plant can protect its employees from radium and its daughter products by keeping the plant adequately ventilated, and by keeping the employees from ingesting radium paint. Alpha rays coming from the floor, the workbench, or an aircraft instrument dial can certainly make a suitable Geiger counter click, but they will not travel far enough to harm living human cells, i.e., it is external contamination. Beta and gamma rays generated by particles in the air can be greatly reduced to safe levels by simply opening doors and windows, or by using some other method of changing the air. The Court has toured the AID Plant and comment is noted hereafter.

There is a third method of exposure to employees. If the radium in the paint decays to radon and that radon gas decays into the particle polonium-218 *before* the gas leaves the paint, then the subsequent radon daughters will give off their beta and gamma rays while still in the paint rather than while in the air. (T.Tr. Vol. 47, p. 3733). Consequently, an employee working with a radioactive instrument dial would be exposed to some beta and gamma rays coming from that dial. Approximately 30% of the radon generated by radium in the paint will escape to the room air while approximately 70% will remain in the paint. This 30% is the radon emanation rate. (T.Tr. Vol. 47, pp. 3787–3791). Although the five alphas of the radium decay chain would not get through the paint or the glass on the front of an instrument, the beta and gamma rays from retained (unemanated) radon daughters will pass through the glass and cause a Geiger counter to click over a foot away. In fact, this physical feature is the best way to separate radium-painted dials from nonradium-painted dials.

Now, if we consider workers at AID, such as the four plaintiffs, we can see that they could receive radiation exposure through three different pathways. First, they could accidentally ingest or inhale paint particles of radium. Second, they could work in the midst of a radon cloud which sends gamma rays through their bodies. Third, they could work in close proximity to large numbers of radioactive dials which would also send gamma rays through their bodies. Much of the expert testimony in this case involved whether or not any of these pathways existed, and if so, whether or not they caused a significant dose to these four plaintiffs. The expert witnesses' opinions on this point were as different as night and day. One group of experts is wrong!

To determine the likelihood of each pathway's existence, one needs to understand how that pathway works and whether or not it leaves any evidence of its existence. If radium is inhaled or ingested, there is an international scientific consensus that 20% of what is taken into the body will pass into the blood. (ICRP 30, Part 1, p. 98). Since radium acts like calcium once inside the body, it will be deposited in bone. (T.Tr. Vol. 47, pp. 3698–3708; Vol. 58, p. 4559). Since it has a 1602 year half-life and remains in the body for many decades, if a significant amount of radium finds its way into the human body, it will still be there when and after that person dies. (T.Tr. Vol. 40, pp. 3198–3199). There is a scientific device known as a "whole body counter", that can measure such minute amounts of radium in the human body that it can find the trace amounts of radium all humans have from the radium found in our environment. (T.Tr. Vol. 58, pp. 4588–4592). The four plaintiffs in this case have had numerous whole body counts, each reported as negative, and which conclusively prove that they have no radium in their bodies. (T.Tr. Vol. 58, pp. 4597–4603; Ex. 19,584). Therefore, the evidence before this Court conclusively proves that no significant amount of radium made its way into the bodies of these plaintiffs while they worked at AID. Consequently, whatever the contamination

at AID, it is scientifically established that these four plaintiffs neither ingested nor inhaled any significant amount of radium while they worked at AID. (T.Tr. Vol. 47, pp. 3698–3708). However, the whole body counts would not show whether or not these plaintiffs received a significant external gamma dose from either radon in the air at AID or from large numbers of instruments in their immediate working area.

If, however, these four plaintiffs had always worn film badges, devices used to measure gamma and beta rays, then clear evidence would exist as to whether or not they received a significant gamma or beta exposure through either of the two remaining pathways. Without this film badge evidence, the Court will have to look to other factors, explained later in this opinion, to determine whether plaintiffs have proven by a preponderance of the evidence either that a large "radon cloud" existed or that there were large numbers of radioactive instruments in the plaintiffs' immediate work area.

*The "Hazardousness" of Radiation.* As stated, plaintiffs have attempted to convince this Court that radiation, in general, and radium, in particular, are extremely hazardous. For example, Dr. John Gofman described radium as "this ultimate hazardous material." (T.Tr. Vol. 7, p. 646). No attempt was made to separate high levels of radiation from drastically lower levels of radiation. In fact, Dr. Gofman constantly referred to certain handbook statements as setting safety standards for the instruments in this lawsuit. However, he failed to inform this Court that the handbook statements referred to amounts of radium 3,000 to 100,000 times larger than the amount of radium on these aircraft instruments. (T.Tr. Vol. 63, pp. 5000–5002). While this numerical difference is astonishing, it is even more revealing to translate it into something in our common experience such as degrees Fahrenheit. Under such a comparison, where one microcurie is equal to 1 ° F, the average aircraft instrument in this case would be approximately 4 ° "hot", whereas the "standards" referenced by Dr. Gofman spoke about items which were 10,-000 ° F "hot" to 300,000 ° F "hot". (T.Tr. Vol. 63, pp. 5002–5003). This Court, hopefully using a sense of common sense, cannot accept the plaintiffs' argument that all, or any, amounts of radiation are extremely hazardous. It follows that no person with common sense would argue that the standards for safety in handling a piece of steel which is at 10,000 ° F to 300,000 ° F must be equally applicable to handling a piece of steel which is only at 4° F.

It also follows that if this Court was to consider all, or any, amounts of radium or radon hazardous, and following plaintiffs' thesis, this Court would have to label our natural environment as ultra-hazardous. This seems absurd. Radium and radon commonly occur in nature in quantities greater than the amounts found on an average aircraft instrument dial. For example, enough radium to make one aircraft instrument dial will be found in approximately every five pickup loads of Kansas dirt. (NCRP 77, p. 23; T.Tr. Vol. 41, pp. 3263–3264). Moreover, radium is found in brick, concrete, cement, plaster, and other common building materials. (NCRP 77, pp. 21–22; T.Tr. Vol. 41, pp. 3260–3261). In Kansas, one public water supply contains enough radium to make one aircraft instrument from about every 200,000 gallons of water. (NCRP 77, p. 49; T.Tr. Vol. 41, pp. 3265–3266). Moreover, radium is commonly found in most foods. (NCRP 77, p. 60; T.Tr. Vol. 41, pp. 3269–3270). Radium is also found in coal in such abundance that a model coal-fired power plant will release from its smokestack in one year enough radium to make 200,000 aircraft instrument dials. (NCRP 77, p. 18; T.Tr. Vol. 41, pp. 3259–3260).

Radon gas is so common that average indoor household air contains 5% of the amount allowed occupationally. (NCRP 77, p. 6; T.Tr. Vol. 41, pp. 3253–3254). The main sources of this radon gas are soil and water. (NCRP 77, p. 13; T.Tr. Vol. 41, pp. 3257–3258). Plaintiffs argue that radium-painted surplus military instruments are very hazardous just because they contain radium which will release radon gas and its

daughter products, thereby creating some radiation exposure to consumers or employees who handle or use these items. For this Court to now adopt such reasoning would require this Court to find that vast numbers of common consumer products are ultra-hazardous just because they are radioactive. NCRP Report No. 56 explains how many common items, such as television sets, smoke detectors, electron microscopes, airport x-ray machines, certain ceramic products, tobacco products, and radium wrist watches, are radioactive. (T.Tr. Vol. 39, pp. 3060–3076). In fact, the aircraft instruments in this case seem to fall into the same general class as luminous wrist watches, pocket watches, or clocks. (T.Tr. Vol. 39, pp. 3065–3068 & 3075–3076). This Court recalls a demonstration in Court which showed that a common "fiesta" or ceramic plate was twice as radioactive as the average of the ten instruments plaintiffs removed from AID, and that a common Coleman lantern mantle was one-half as radioactive as the average instrument plaintiffs removed from AID. (T.Tr. Vol. 40, pp. 3189–3195).

It was about this time that the plaintiffs' cases began to erode, for indeed, Gallaghar's Geiger readings, or at least the emphasis given to them, appeared misleading when compared with other materials that are radioactive.

Also, radiation scientists recognize the existence of natural background radiation. This is radiation all humans receive no matter where or how they live on this earth. It may vary somewhat from place to place to the degree that someone living in Denver, Colorado, gets approximately twice the background radiation as someone living in Washington, D.C.

Although mankind has produced many sources of radiation, natural background remains the greatest contributor to the radiation exposure of the U.S. population today. Background radiation has three components: terrestrial radiation (external), resulting from the presence of naturally occurring radionuclides in the soil and earth; cosmic radiation (external), arising from outer space; and naturally occurring radionuclides (internal), deposited in the human body.

BEIR III at p. 37.

In arguing that radiation is hazardous without specifying the levels of exposure, plaintiffs have surely painted their case with a broad brush! For this Court to hold that something is hazardous just because it causes a Geiger counter to click is over-simplistic and would force this Court to logically conclude that nature itself is ultra-hazardous. This is not to say that the amount of radiation which can kill the average human within a few days, the lethal dose, is not hazardous. The important factor that must be known before a "hazardous" label can be attached with any degree of scientific validity is the amount of radiation with which one is dealing, and this is what the case is really about.

*Radiation Dose.* Fortunately, radiation scientists have developed instruments capable of measuring very small amounts of radiation and a system of labeling which can express both very small and very large amounts of radiation. A basic understanding of these units of measurement is important to place the radiation involved in this case into a meaningful context.

The number of rems or mrems a person gets during a specific unit of time, such as during employment at AID, is known as that person's dose. (BEIR III, pp. 516–517). The specialty of measuring or estimating a person's dose is the science and art of dosimetry. (T.Tr. Vol. 39, p. 3087).

In order to make these units of measurement more meaningful, it is of interest to note what doses some common experiences yield. The earth in Florida gives a person living there a dose of approximately 23 mrem per year. If a person lives there for 64 years, he will receive a dose of $64 \times 23$ mrem = 1472 mrem from Florida dirt in a lifetime. (BEIR III, p. 38). This is equal to 1.472 rem. If another person lives in Colorado for 64 years, he will receive a dose of $64 \times 90$ mrem = 5760 mrem from Colorado dirt in a lifetime. (BEIR III, p. 38). This is equal to 5.76 rem. In 1970,

approximately 129,000,000 Americans were exposed to x-rays for medical or dental purposes. (BEIR III, p. 45). X-rays are a form of ionizing radiation almost exactly the same as gamma rays except for their source. The average American by age 64 will receive about 6.5 rem of radiation from x-rays. (BEIR III, p. 47). Consequently, total doses of approximately 12 rem would be common for a Colorado resident who had normal exposure to dirt and x-rays.

In addition, a person will receive some exposure from other sources, including consumer products. Television sets and radium wrist watches give users a dose of 1 mrem per year to their gonads. (BEIR III, p. 63, Table III–20). Construction materials and radium clocks give whole body doses to people of approximately 7 to 9 mrem per year. (BEIR III, p. 63, Table III–20). Measurements made of the ten instruments plaintiffs removed from AID yield an average of 3.5 to 3.76 microcuries of radium-226 per instrument. (Auxier Report, p. 11, Table 1; Maletskos Report, p. 4, Table 1). The Court finds these witnesses' testimony, findings and reports are reliably calculated. Luminous dials on surplus instruments range from .06 microcurie to 4.4 microcurie. (NCRP 56, p. 52, Table 13). Alarm clocks typically contain 0.4 microcurie of radim-226 and pocket watches contain 1 microcurie of radium-226. (NCRP 56, p. 52, Table 13). Wrist watches may contain 4.5 microcurie of radium-226, which is more than the average of the 10 aircraft instruments here. (NCRP 56, p. 19). Consequently, it is clear that the instruments at AID are in the range of radioactivity of luminous wrist watches, pocket watches, and clocks. BEIR III has told us that these luminous products create about as much dose as television sets and construction materials. Consequently, an understanding of dose shows us that it would be scientifically incorrect to label the aircraft instruments involved in this case as "ultrahazardous" just because they do emit radiation. Further discussion in this area will follow.

The question remains of the exact dosage these plaintiffs received while employed at AID, and whether that total dose should be considered hazardous. As will be explored later in this opinion, the answer depends upon just what assumptions are made by the expert witnesses who have attempted to "reconstruct" a precise dose for these plaintiffs. Defendant's experts generally testified that the doses were 7 rem or less, while plaintiffs' experts generally testified that the doses were hundreds or thousands of rems. (T.Tr. Vol. 2, pp. 208–215). Obviously, this is a huge, unbridgeable gap. If defendant's experts are correct, the doses these plaintiffs received at AID are less than the doses the average person will get in his lifetime from dirt and x-rays. If plaintiffs' experts are correct, then the doses these plaintiffs received at AID are so large that it is scientifically reasonable to consider them likely to cause harm and to label them "hazardous" or even lethal.

The important point to understand at this time is that the label "hazardous" cannot be broadly attached to anything that is radioactive without an understanding of the doses involved. To this extent, plaintiffs' experts' attempts to describe all quantities of radium as "this ultimate hazardous material" must be rejected as unscientific if not outright misleading. (T.Tr. Vol. 7, p. 646).

*Establishment of Radiation Safety Standards.* The dangers of radiation first became a concern to the medical profession when early radiologists used x-ray machines without shielding themselves from the beam. Safety recommendations were made by the Germans in 1913, the British in 1914, and by the U.S. in 1922. In 1928, a small group of eminent international scientists formed the first international scientific commission to discuss and recommend safety standards for the use of radiation. That group was the International Commission of Radiological Protection (ICRP). (BEIR III, p. 7). Dr. Lauriston Taylor, probably this Court's favorite witness, was one of the founding members of that group. Since 1928, the ICRP has translated the views and research of the most

eminent radiation scientists world-wide into specific radiation protection recommendations. These recommendations have been in reports which have become the most authoritative sources of information in this developing science. For example, the international consensus that 20% of inhaled or ingested radium paint will be absorbed into the blood of a human being is recorded in ICRP No. 30, Part 1, p. 98.

In 1929, Dr. Taylor also organized a similar group in the United States which is known as the National Council on Radiation Protection and Measurements (NCRP). (BEIR III, p. 7). This group is composed of many of the most eminent scientists in this field in the United States. It publishes handbooks known as NCRP Reports. This opinion has already referenced NCRP Report Nos. 77 and 56 extensively.

These two groups of the most knowledgeable and most eminent scientists have spent many hours studying scientific papers that in turn reflect many hours of scientific work in order to determine what levels or amounts of radiation should be considered safe enough to use as safety standards. This Court is certainly ill-equipped to second guess those scientists by setting different standards of safety in these tort suits.

Dr. Taylor testified that the standards were originally set at 36 rem of whole body gamma ray or x-ray exposure per year in the United States, and 72 rem of whole body gamma ray or x-ray exposure per year in Europe. (T.Tr. Vol. 63, p. 4978–4979). Thousands of individuals were exposed to gamma and x-ray radiation while these standards were in effect without any evidence of harmful effect. (T.Tr. Vol. 63, p. 4980). After World War II, there was increased concern for radionuclides which might get into the human body and irradiate tissue with alpha particles. It was primarily the work of Dr. Robley Evans, whose studies over four decades showed that persons whose bodies had accumulated no more than a microgram (same as microcurie for radium) of radium did not develop bone sarcomas. It provided the first standard (1,000 rad or 20,000 rem) for radioactive material inside the human body. (T.Tr. Vol. 63, pp. 4981–4990). Using this "Radium Standard" as a yardstick, the radiation scientists used the standard toxicological assumption that 1/10 of the level at which harm could be found was a safe level. (T.Tr. Vol. 40, pp. 3162–3165). Thus, 1/10 of the amount of radium which would cause an observable effect became the safety standard for allowable radium in the human body. This amount was referred to as the maximum permissible body burden (MPBB). This acceptable level of radium in the body was first recommended by the NCRP in Handbook 27 published in 1941. NCRP and ICRP Committee No. 2, headed by Dr. K.Z. Morgan, published reports in 1954 and 1959, establishing MPBB's for radium and for many other radionuclides which could be taken into the human body. This MPBB for radium would result in a lifetime dose of 1,000 rad or 20,000 rem.

In order to determine what levels of radionuclides could be circulating in the air of the work place without posing a hazard, it was determined what radon concentrations could exist in the air breathed by an employee working 40 hours a week, 50 weeks a year, for 50 years, without achieving a MPBB in that worker. This allowable level became the maximum permissible concentration in air (MPCa). In other words, if the air contained 1 MPCa of radium, a worker could still safely work there for 40 hours a week, 50 weeks a year, for 50 years, without accumulating a MPBB in his body. It must be remembered that an MPBB for radium was still only 1/10 of the amount that showed any evidence of causing harm. Consequently, it would be scientifically wrong to assume harm to workers just because the MPCa or the MPBB were exceeded in a certain case. These standards of internal exposure were actually based, in part, on the fact that radium only showed a harmful effect at high levels, and they remain essentially unchanged today. (T.Tr. Vol. 63, pp. 5030–5031).

The first whole body dose limits for x-rays and radium were recommended in

1934 by the NCRP at a level of 0.1 roentgen (R) per day (36 R/yr), and by the ICRP of 0.2 roentgen (R) per day (72 R/yr). These were reduced to 15 rem per year by the NCRP in 1948 and by the ICRP in 1950. A further reduction by both the NCRP and ICRP took place in 1956. Today the dose limit both nationally and internationally is 5 rem per year. (T.Tr. Vol. 63, pp. 5039–5040). Dr. Taylor explains that these reductions were not made because there was any evidence that people were being harmed by exposures at higher levels. Rather, they were arbitrarily made because there was an unfounded concern for genetic effects and the technology had so advanced that workers were, in fact, receiving doses less than these levels anyway. (T.Tr. Vol. 63, pp. 5040–5041).

Today, there are three standards relevant to these cases which are nationally and internationally accepted as safety standards. The first is that a radiation worker is allowed to receive 5 rem of whole body gamma exposure for every year he works after the age of 18. This is sometimes known as the 5 rem/yr occupational limit or the 5(N–18) rule where N equals the age of the worker. The second standard is that any individual in the general public is allowed to receive 500 mrem gamma exposure each year. These first two standards are external radiation standards. The third standard is an internal radiation standard expressed as one MPBB of a radionuclide. As already noted, the MPBB of radium is 0.1 microcurie. In order not to exceed this level over a lifetime of occupational exposure the MPCa should not be exceeded. This Court readily adopts these exposure standards since it is apprised of no reason to disagree with the national and international consensus of eminent radiation scientists, the views of Drs. Morgan and Gofman notwithstanding.

*Biological Effects of Ionizing Radiation.* Just as the ICRP and the NCRP have gathered the best radiation scientists to make recommendations and to publish reference handbooks, other organizations have gathered eminent radiation scientists to report the scientific consensus on the biological effects of ionizing radiation. Examples of such works are the National Academy of Sciences Biological Effects of Atomic Radiation (BEAR) Reports, the United Nations Scientific Committee on the Effects of Atomic Radiation (UNSCEAR) Reports, and the National Academy of Sciences Biological Effects of Ionizing Radiation (BEIR) Reports. (BEIR III, pp. 7–9).

The most recent is the 524-page BEIR III Report which has already been extensively referenced in this opinion. It contains detailed discussions of many topics of direct relevance to most of the issues in this litigation. This report is written by the most eminent radiation scientists in this country, including Dr. Jacob Fabrikant, probably the United States' most eminent witness. It represents the range of diversity as well as the consensus of these scientists. As indicated, this Court accepts BEIR III as eminently authoritative and will continue to cite it as the Court comes to the task of applying these general scientific principles to the facts of these four plaintiffs' cases.

*Threshold Hypothesis and Linear Hypothesis.* As with many potentially toxic agents, there may be a certain dose of radiation below which no harm will occur to the human being. If there is in fact a threshold of exposure below which carcinogenic effects do not occur, science has not yet proven or disproven it, thus any current measurement of such a threshold must be termed a threshold or nonthreshold *hypothesis.* (BEIR III, p. 524). Dr. Robley Evans' work with the radium dial painters study has provided some solid evidence that a practical threshold for injury from inhaled or ingested radium-226 may well exist at the 1000 rad or 20,000 rem dose level. (Ex. 19,191; T.Tr. Vol. 40, pp. 3162–3164).

The general evidence which does exist for a carcinogenic effect from radiation occurs where doses were approximately 50 to 100 rem or above. (T.Tr. Vol. 40, pp. 3157–3158). Large groups of people exposed to these high doses do show some

excess cancers above those normally expected. However, the problem comes in interpreting how this risk at high doses should be extended or extrapolated to a risk at low doses, such as 25 rem and below. If one assumes that the risk per rem is the same at low doses as it is at high doses, one is assuming that if a million people exposed to 100 rem will have 10 excess cancers, then a million people exposed to 10 rem will have one excess cancer and a million people exposed to one rem will have 1/10 of one excess cancer. When such an assumption is drawn on a standard dose response graph, the result is a straight line. This assumption is known as the linear hypothesis. (BEIR III, p. 520; T.Tr. Vol. 40, p. 3159).

As the name itself notes, this assumption is not proven fact. It is only a hypothesis. (T.Tr. Vol. 40, p. 3159). Webster's Dictionary tells us that any hypothesis is "a tentative assumption made in order to draw out and test its logical or empirical consequences." A hypothesis is synonymous with a theory. Consequently, any hypothesis or theory is not fact until it has been scientifically proven. Anyone who has been trained in the scientific method realizes that a hypothesis is a scientist's educated speculation. The scientist then designs experiments to test his hypothesis in order to determine whether or not his speculation is correct. If the tests do not prove the hypothesis, then the scientist must abandon it and engage a new one. That is how scientists learn what is fact and what is not true.

In the field of radiation science, the linear hypothesis and the threshold hypothesis are not the only theories used by respected scientists to predict the carcinogenic effect of radiation. There is also the quadratic hypothesis which suggests that a low dose of radiation is less carcinogenic per rad than a high dose of radiation. When the quadratic hypothesis is drawn on a standard dose response graph, the result is a downward dipping curve. (BEIR III, p. iii; T.Tr. Vol. 40, p. 3159). Another theory is the linear-quadratic hypothesis. This one blends aspects of the linear hypothesis with aspects of the quadratic hypothesis. It yields a curved line on a standard dose response graph which falls between the linear line and the quadratic curve. (T.Tr. Vol. 40, pp. 3159–3160).

Beginning before World War II, the eminent world scientists who set recommendations for radiation safety standards realized that they did not know which hypothesis was actually true, and to be cautious, they assumed that there was no threshold. This is contrary to standard toxicological science which assumes that there is a threshold for all harmful chemicals. With no threshold, the scientists had to then choose which of the remaining hypotheses should be used. They chose to use the linear hypothesis because it produces the greatest hypothetical risk at low doses. In other words, these scientists deliberately chose to over estimate risks at low dose rather than to under estimate risks at low dose. This is known as a conservative approach because the real risks may, in fact, be much lower or even nonexistent at low doses of radiation than the simple linear hypothesis predicts.

Twenty-one of the eminent scientists who comprised the National Academy of Sciences 1980 BEIR III Committee reviewed the world's scientific literature and decided that the linear-quadratic hypothesis best estimates the real risks at low dose. One member of BEIR III argued that the linear hypothesis was better, while one other member argued that the quadratic hypothesis was better. (BEIR III, pp. iii–iv). This range of scientific opinion "best illustrates the degree to which scientists disagree on this subject in absence of sufficient evidence to compel conclusion." (BEIR III, p. iv). It is important to underscore again that a court of law is not a scientific experiment. When a court of law determines responsibility for human suffering and awards damages, it must do so based upon reasonable evidence, not upon speculation or hypothesis. Just because scientists use hypotheses to describe something they really don't know for sure does not justify a court of law in using speculative hypothe-

ses to determine that one person has caused harm to another.

This is not to say that the various hypotheses used by radiation scientists do not have a valid place in court. They are very helpful in setting safety standards. However, an informed court must guard against using hypotheses for more than what they really are. Speculation is not valid and trustworthy evidence even though that speculation is conservative, and comes from eminent scientists. Lawsuits must be resolved by reasonable conclusions based on the evidence, not by educated guesses.

*Statistical Risk Calculations.* In this field of science, speculation does not end with the hypothesis scientists chose to use. Rather, that is just the beginning. While more fully discussed in later parts of this decision, perhaps the best example of scientific speculation was the testimony of Dr. Karl Z. Morgan. He gave a bottom line opinion that radiation at AID had a 76.2% to a 99.7% probability of causing these plaintiffs' cancers. (Ex. 12,382A). He called this "almost a certainty." (T.Tr. Vol. 1, p. 143). While this seems to the inexperienced person to be solid scientific evidence at first glance, when one probes how Dr. Morgan got to his final conclusion, one realizes that it is statistical speculation based upon speculative dose estimates and speculative risk assumptions. In other words, it is speculation based upon other speculation.

The statistical approach used by Dr. Morgan is known as a probability of causation calculation. Mathematically, the risk of a certain dose of radiation is divided by the sum of that same risk and the natural risk of cancer. While this is a proper mathematical formula for calculating the probability of events which have happened, and if well founded, which it is not, may be of some interest as regards the risk assessments relating to any exposure, its results are only as valid as the assumptions which go into it. For example, if the dose estimates which are used are not correct, the final result has to be wrong. If one uses the linear hypothesis to produce an answer, that answer is questionable because the quadratic hypothesis produces an entirely different answer. If a particular individual is exposed to the various other carcinogens at a level different from the level at which an average person in the general population is exposed, then the formula's assumed natural rate of cancer is incorrect for that individual and the final answer is again wrong. If a particular person with lung cancer was a heavy smoker, the formula is guaranteed to yield an inaccurate answer unless some allowance is made for the probability that the heavy smoking rather than the radiation could have caused the cancer. When Dr. Morgan confidently used this mathematical formula to predict that radiation causes lung cancer in a person who has been a heavy smoker for 50 years without including in his calculations this increased risk from smoking, he illustrates how easily this formula can be used to mislead a court, and probably some *juries,* rather than to solve the question of what really caused a particular plaintiff's cancer. (T.Tr. Vol. 56, pp. 4374–4378).

Moreover, a formula like this entices the expert witness to calculate backwards. If the witness desires to have a final result of over 50%, i.e., more probable than not, that can easily be accomplished by playing with the input numbers until the output is what that witness wanted. For example, if one increases the risk per-rad-input figure, the output is a higher percentage. If that still does not yield over 50%, then one can simply find ways to increase the dose estimate until the magic figure is reached. These comments should not be taken to mean that a probability of causation calculation is without any value. It can be helpful as a supporting argument for other evidence, but an informed court should realize its limitations and assure that the input data represent reasonably valid assumptions and reflect scientific consensus because the result will magnify any error or uncertainty in the input data. As learned here, a court must consider statistical risk calculations with a healthy degree of skepticism and must not rely upon this method to

provide an easy answer to a complex problem.

Now, with a basic understanding of the complex science which this Court will apply to the facts of this case, the Court turns to the facts to determine whether the United States is liable for the injuries of the plaintiffs.

## IV. *Facts*

At the end of World War II, the United States owned many items which had been purchased or manufactured for the war. Aircraft instruments with radium-painted dials were among these items. It is important to realize that at this point in time radium dials were not exclusively used by the military, rather they were widely used by commercial and private aircraft because they were virtually the only means of illuminating cockpit instrument panels in the nighttime. (NCRP 56, p. 23). Also, radium paint was used on many other items ranging from gunsights to watch dials. (NCRP 56, p. 51). After the war, some of these items were sold as surplus. Consequently, they made their way into surplus stores, and many of the aircraft instruments were overhauled for use in private airplanes.

There is a large aircraft manufacturing industry in Wichita, Kansas. Aircraft instruments are required to be overhauled after a specified flying time. Consequently, there developed in Wichita an industry to manufacture new aircraft instruments and overhaul used ones for recertification. As would be expected, many of the World War II surplus aircraft instruments with radium dials found their way to the numerous companies in Wichita which specialized in overhauling such instruments. Aircraft Instrument Development, Inc. (AID), for which the four plaintiffs worked, was one of these companies. AID was created in 1967. Before that time, other plants in Wichita overhauled radium dial instruments.

The instrument dials were repainted with radium paint during the overhaul process for only a short time after World War II; later radium paint was discontinued and replaced with a matte paint which reflects electrical lighting. The old radium-painted dials were either thrown away or stripped and repainted with matte paint. While some plants in Wichita, such as Air Capitol Dial (ACD), did repaint with radium paint, AID never did. This is an important distinction because it means that the most important exposure pathway in the radium dial painters study did not exist at AID. This study greatly assists the Court in understanding the effects of exposure, if any, in a circumstance arguably comparable to plaintiffs' claims should the plaintiffs establish an environment remotely comparable to that of the radium dial painters.

*Scientific Studies of Radium Paint Hazards.* The radium dial painters study is a long-term follow up of all the people in the United States who had been exposed to radium. (T.Tr. Vol. 58, p. 4562). Dr. Robley Evans began the study decades ago and it is now conducted by the Center for Human Radiobiology at Argonne National Laboratory under the direction of Dr. Robert Rowland. Dr. Rowland was a most refreshing and wholly qualified witness who testified as to the significance of the study, and his ability to articulate the significance was most helpful.

The young women who were dial painters each had a vial of radium paint at her workspace sufficient to cover an equivalent of 300 aircraft instrument dials. (T.Tr. Vol. 46, pp. 3760–3767; Vol. 58, pp. 4571–4576). The young women pointed their brushes with their lips in order to produce a thin line on the dial. (T.Tr. Vol. 58, pp. 4592–4593). Consequently, they unintentionally ingested large amounts of radium by placing the paint brushes in their mouths. (T.Tr. Vol. 50, p. 3163). The ingested radium was absorbed by their blood and deposited in their bones, where it led to some cases of bone cancer and paranasal sinus cancer in women who received significant doses. (T.Tr. Vol. 58, pp. 4593–4594). Dr. Robley Evans and Dr. Robert Rowland have conducted this extensive study for over half a century. One of their basic findings is that no significant excess number of tumors appear in women who re-

ceived a dose of less than approximately 1,000 rad or 20,000 rem. (Ex. 19,191; T.Tr. Vol. 40, pp. 3162–3166; Vol. 63, pp. 4983–4988). This fact is sometimes referred to as the 1000 Rad Threshold for Radium-226. Another important finding is that extensive exposure to radium-226 paint only causes bone cancer and cancers of the paranasal sinuses. (T.Tr.Vol. 40, pp. 3166–3167; Vol. 58, pp. 4643–4649). While early reports indicated that some other cancers may have appeared in excess amounts, the latest data is that no other types or forms of cancer appeared among dial painters in amounts above those normally expected in a similar population exposed to only background radiation. (T.Tr. Vol. 58, pp. 4643–4649).

It is significant that the one pathway that caused the problem in the dial painters did not exist among employees at AID. It is also significant that none of the four plaintiffs have bone cancer or cancer of the paranasal sinuses, which are the only cancers which have been scientifically associated with occupational exposure to radium in paint. Additionally, body burdens of each plaintiff, including the exhumed bodies of Johnston and Vessels, are essentially negligible. Ironically, it is noted that Dr. Morgan calculated the doses of Mewhinney and Womack using findings from the Geiger Study, which reflected positive body burdens. The Court cites this as an example of the extent to which Dr. Morgan engaged in liberties with the factual data in these cases. Further comment is reserved.

Long before AID ever existed, radiation scientists were concerned about the radiation doses people might receive from surplus instruments. Perhaps the first group which studied this potential problem was the National Bureau of Standards. Around 1944, the bureau began a nationwide radon testing program involving 125 dial refinishing plants, seven of which were in Wichita, Kansas. (T.Tr. Vol. 63, pp. 5032–5039). Because these people were not ingesting radium like the dial painters, the study focused on radon gas. Because radium decays to radon gas, if there is a large amount of radium contamination in an unventilated workplace, there may be a hazardous amount of radon gas in the air. Radiation scientists had set the safety standard at one MPCa of full-time exposure for 50 years, so the National Bureau of Standards examined plants to see if the one MPCa was consistently exceeded. The results of this study showed that among the 125 plants examined, including the seven in Wichita, the one MPCa safety standard was not consistently exceeded even though it was at times exceeded. (T.Tr. Vol. 63, pp. 5038–5039). Because one MPCa for a period of 50 years creates one MPBB, the period of days of exceeding the MPCa is averaged with the days of not exceeding it. By 1953, Dr. Taylor, under whose supervision the program was then being conducted, made the administrative decision to terminate this testing program since the results showed that no health hazard existed in any of these plants. (T.Tr. Vol. 63, p. 5033).

The next scientists to examine this precise problem were Halperin and Heslep, who published an article titled "Radium in Military Surplus Commodities" in 1966. (Ex. 9541). At the time of publication, Mr. Halperin was Chief of the Radiological Health Section of the Kansas State Department of Health, and Mr. Heslep was Chief of the Bureau of Radiological Health of the California State Department of Public Health. (Ex. 9541). Halperin and Heslep examined a sample of 37 retail "surplus" stores in California to determine how much radioactive material they contained and what the dose might be to the public. It is interesting to note that when Halperin and Heslep's workers examined these stores for radioactive materials, they did not use an audible Geiger counter which would attract attention and warn shoppers and sales personnel that doses were as high as 5 mrem per hour on the faces of bins and 2 mrem per hour in the aisles. Rather, they removed instruments "to a remote part of the store" for measurement because "the sight of a person examining merchandise with a survey meter proved to be disconcerting to both customers and sales personnel." (Ex. 9541, p. 2). Apparently, neither

Halperin nor Heslep felt that the situation was so dangerous that either customers or employees needed to be warned. In fact, they concluded:

> It appears that no major health problem is involved. On the other hand, the present situation deserves serious consideration if the basic philosophy of radiation protection, that is, the elimination of all unnecessary radiation exposure, is to be followed.

Ex. 9541, p. 5.

While "the elimination of all unnecessary radiation exposure" may be commendable, that is not the task of this Court. The Court must focus only upon whether or not a "health problem is involved," and precisely upon whether or not radiation at AID caused cancer in these four plaintiffs. In attempting to eliminate all unnecessary exposures, Halperin and Heslep suggested that:

> The disposal procedures of the Defense Supply Agency should be directed toward the removal of radioactive items rather than toward notification of potential purchasers of items that may contain radioactive material.

Ex. 9541, p. 5.

Apparently these researchers concluded that the potential health danger posed by these items was not sufficiently significant to require the government to label the items as radioactive. Instead, the United States was urged to move toward removing such items from future (after 1966) surplus sales. When the researchers contacted the government with their suggestions, they realized that "such a policy is difficult to implement in practice...." (Ex. 9541, p. 6). Consequently, the researchers urged the government to:

> "investigate the problem and adopt appropriate regulations so that most, if not all, radioactive items would be removed from surplus commodities before the surplus is released to the general public .... If this is not feasible, the Defense Supply Agency should require the purchaser of a radioactive item to comply with the radiation control regulations of the State in which the sale takes place or the State in which the device will be used."

Ex. 9541, p. 6. These suggestions boil down to two items: either removal of radioactive items from surplus after 1966, or regulation of purchasers to see that they follow state safety standards. Although plaintiffs' experts argue that radium dial aircraft instruments which found their way into AID should have been labeled to avoid the serious health hazard which they claim existed at AID, Halperin and Heslep wrote in 1966 that a health hazard did not exist and they did not recommend labeling as a solution to "the elimination of all unnecessary radiation exposure." In fairness to plaintiffs' claims, the Court notes that this 1966 article is not directed to either the conditions in aircraft instrument overhaul plants in general nor to the conditions at AID in particular.

In 1967, AID started operations in Wichita. During 1966 and 1967, the United States Public Health Service conducted a study of working conditions in 15 aircraft instrument repair plants in Wichita. One of these was AID! The results of this study were published in 1969 as PHS Publication No. 999–RH–35, titled "Evaluation of Radium Contamination in Aircraft Instrument Repair Facilities." (Ex. 12,189). The researchers were Eric L. Geiger and Gail Schmidt, and this study has been referenced as the Geiger and Schmidt Study. It contains some of the best hard evidence available in this case because it covers AID and other similar plants during some of the years involved in this litigation. However, the plants are identified by letter, not name. The parties have stipulated that Facility C is ACD, but AID is not readily identifiable. Before we examine Geiger and Schmidt's specific measurements in these plants, a more detailed review of conclusions is in order. After measuring radium surface contamination, radium-226 uptake in workers, radon gas levels, gamma levels in general work and storage areas, and radium particles in the air, they concluded that:

The probability of a worker in an aircraft instrument repair facility receiving a whole body dose from beta or gamma radiation in excess of 500 mr/yr is very small.

Ex. 12,189, p. 11.

This conclusion becomes extremely significant, because 500 mrem/yr is the amount of radiation national and international safety standards allow for any member of the general public in any year. In other words, anyone living in Wichita is allowed to get 500 mrem/yr. Consequently, Geiger and Schmidt have concluded that the employees at these plants are not getting any more radiation per year than is allowed for any person on earth who is not classified as a radiation worker. The national and international safety standards for people who work with radiation is 5 rem per year, which is equal to 5,000 millirem per year. In other words, after their extensive research in this precise working environment, Geiger and Schmidt tell us that employees in this industry are very unlikely to receive even 1/10 the amount of yearly radiation that is considered safe for a radiation worker.

The Court next examines some of the precise findings of Geiger and Schmidt. When the researchers examined radium surface contamination, they found "significant amounts ... in all cases where dial stripping was being done currently or had been done in the past." (Ex. 12,189, p. 5). It is here that the Court began to distinguish contamination, i.e., external alpha contaminants, from radiation, i.e., harmful to health, as the layman perceives it. It is assumed that AID was an average plant in this industry unless plaintiffs can establish otherwise. Consequently, AID is expected to have significant amounts of surface radium contamination. Indeed, as shown herein, that was true.

When Geiger and Schmidt examined radium intake in the workers, they found that only two workers from ACD, who both painted dials with radium paint, had significant body burdens, but neither had even one-half of a MPBB. (Ex. 12,189, p. 15).

It must be remembered that the MPBB had originally been set at 1/10 of the amount for which evidence of harmfulness existed. All other employees measured with a device known as a whole body counter showed such low levels of radium that they were below the levels the machine could accurately count. (Ex. 12,189, p. 15, table 6). If we assume AID is an average plant and that it did not paint dials with radium paint, then we would not expect to find any whole body counts of AID employees above normal. Indeed, this what the evidence shows.

When the researchers measured radon gas levels, they found that in ACD, where active painting with radium paint was performed, the radon gas levels were 3.7 times larger than the MPCa. (Ex. 12,189, p. 10). A careful examination of the actual measurements at ACD reveals that the researchers carefully noted that the two highest samples were obtained from contaminated measuring devices so their accuracy is highly suspect. (Ex. 12,189, p. 10, table 5). When these two values and the other extreme value are rejected, the average MPCa falls from 3.7 to about 1.9 or .5. (T.Tr. Vol. 58, pp. 4697–4698). One MPCa means that a worker can work there full time for 50 years and still receive a dose only 1/10 of the amount thought to be harmful. Three and seven-tenths MPCa would mean that a worker could only work there for 13.5 years before the safety standard would be exceeded. One and nine-tenths MPCa would limit the worker to 26 years of employment, but .5 MPCa would allow 100 years of employment. When the researchers measured the radon gas levels in the other plants, including AID, they found that none of the others exceeded 30% of the MPCa or .3 MPCa. (Ex. 12,189, p. 10). Consequently, in those plants, including AID, an employee could work there for 166 years without exceeding the safety standard for exposure to radon gas. If we assume that AID was a typical plant, then we would not expect to find any significant "radon cloud" in the plant. This is what the evidence will establish.

When the researchers measured the gamma ray levels in the general work areas, they found that gamma ray levels above 2 mrem/hr were frequently found in "a drawer or box where dial faces were stored or on shelves where complete instruments were stored." (Ex. 12,184, p. 11). More than 2 mrem per hour for 2,000 hours a year could equal a yearly dose of 4,000 mrem or 4 rem. Since none of the employees would spend all year working inside a storage drawer or box or on a storage shelf, these levels would not represent average exposures. To find average exposures, the researchers actually placed measuring devices, i.e., film badges, on representative workers and measured their doses for two months. (Ex. 12,184, p. 11). The badges measured both gamma and beta rays and showed such low doses that the researchers concluded: "The probability of a worker in an aircraft instrument repair facility receiving a whole-body dose from beta or gamma radiation in excess of 50 mrem/yr is very small." (Ex. 12,184, p. 11). If AID is typical of these facilities in Wichita, we would expect these plaintiffs to have low gamma and beta exposures. Indeed, that is what the evidence shows, as will be explained later.

When the researchers measured the amount of radium-226 particles in the air, they conducted eight hour tests with a portable air sampler to measure mostly long-life alpha emitters. While such a test would also measure some radon gas daughters in the air, since these daughters have a brief half-life and the filter paper was not measured until five days after collection, the radiation actually measured could safely be assumed to be alpha particles from radium. The results once again showed that ACD, where painting with radium paint was being done, had the highest levels. The levels at ACD were 25% of the MPCa, which means that an employee could work there for 200 years without exceeding the safety standard. (Ex. 12,-184, p. 8). Levels at Facility B were 10% of the MPCa, while levels at Facilities A and H were only 1% of the MPCa. Consequently, an employee at Facility A or H could work there for 5,000 years before exceeding the safety standard. It is evident that radium in the air was not a problem at any of these plants, and that fact correlates with the negative whole body counts, except for the two people who actually painted with radium paint at ACD. Consequently, if AID is a typical plant, we would not expect to find any significant amount of radium in the air. This, in fact, is what the evidence will show.

After this extensive and detailed examination of whether or not a health hazard existed for workers at these Wichita plants, including AID, Geiger and Schmidt concluded that while there was measurable alpha contamination, such that a layman could be fooled into thinking an ultra-hazardous situation existed because a Geiger counter clicks a lot and audioradiographs can be made, this "surface" contamination has not caused an internal dose problem like the radium dial painters experienced. Therefore, "the negative data ... allow one to draw the general conclusion that work under these conditions has not resulted in excessive internal exposure." (Ex. 12,184, p. 16).

Even though Geiger and Schmidt made specific recommendations for the industry to clean up the contamination and prevent it from reappearing, the researchers noted that these plants "have not showed a willingness" to effectuate such control. (Ex. 12,184, p. 30). Yet, they noted that:

> The problem may be diminishing, however, in that most of the instruments worth rehabilitating have already had the radium dial replaced with a nonradium dial.

Ex. 12,184, p. 30.

If AID was a typical business in this industry, we would expect to find contamination in the workplace but no health hazard to employees. Moreover, we would expect to find less contamination at AID than exists at ACD because AID did not paint dials with radium paint and because AID started operations after most instruments worth rehabilitating had already had

their radium dials replaced. The data and conclusions of Geiger and Schmidt's extensive study tell us what conditions were at AID during this 1967 survey, but do not prove what the conditions were at AID during the subsequent years of its operation. Nevertheless, they do set some perimeters of reasonable expectations for future years unless plaintiffs can prove that AID changed its operations in such a way that it was no longer typical of these types of facilities in Wichita.

In 1971, Schmidt, Halperin, Geiger and Livingston published a follow up study which also included 15 repair facilities in Florida. These researchers conducted their study "in order to evaluate the radiation hazard and to develop a recommended radiation control program for aircraft instrument repair facilities . . . ." (Ex. 12,190, p. 8). After reviewing essentially the same data reported by Geiger and Schmidt in 1969, these four researchers concluded the following about their expanded survey:

> It was expected at the onset of these studies that the data might help answer the question—what is an acceptable contamination level? As noted above, only facility C had individuals with positive radium body burdens. Thus, the conclusions that can be drawn with regard to a relation between contamination and internal radiation hazard is rather limited. The negative data do, however, allow one to draw the general conclusion that work under these conditions has not resulted in internal exposure exceeding the maximum permissible body burden.

Ex. 12,190, pp. 12–13.

Although plaintiffs argue strongly that the United States should have labeled radioactive surplus dials in order to solve what plaintiffs argue was a serious exposure problem, this Court notes that labeling is not seen as a cure nor is it even recommended by researchers Halperin, Heslep, Geiger, Schmidt or Livingston. In fact, the 1971 article covering 30 repair facilities seems to reject labeling as a good way to solve the problem.

> Dial faces containing radium and aircraft instruments containing radium dials should be segregated using a beta-gamma survey meter from those that do not contain radium. Visual segregation of radium luminous dials is not accurate nor acceptable.

Ex. 12,190, p. 14.

Labels can only provide visual segregation. If that is not acceptable to these researchers and a Geiger counter must be used on each instrument regardless of the presence or absence of a label, then labels would not seem to make any significant difference other than to generally inform the industry that some dials may be radioactive. Since the National Bureau of Standards conducted radiation tests among 1225 facilities in this industry for nine years, since some members of the industry actually painted with radium, since the USPHS conducted a 2-year radiation study at 15 plants in Wichita, and since one of the prime researchers in this area was the Chief of the Radiological Health Section of the Kansas State Department of Health, it is very difficult to see how both management and employees in the industry, including AID, could have been unaware that some dials were radioactive. Consequently, it is reasonable to expect that both management and employees at AID knew, or should have known, that some of the dials they worked with were radioactive. As indicated, however, this is not the plaintiffs' principal problem.

*Radium Dials at AID.* AID would have received used instruments with radium dials from two basic sources during the period of time of concern in this litigation. The first source would be instruments owned by the United States which were sent to AID for reconditioning and then were returned to the United States. These were not surplus instruments. The second source would be instruments which were sold as surplus to either AID or to some other entity, including those provided by dismissed defendants, which later transferred them to AID.

## V. The Plaintiffs' Case in the Face of All of the Evidence

As previously indicated, the plaintiffs' tactic of having tendered the expert opinions at the outset of their case, coupled with a proffer of proof, and the United States' acquiescence in this process, has created for the Court a tedious task of weighing all the evidence. Even when the plaintiffs rested, in light of the absence of the government's objections, or the Court's opportunity to timely rule, the Court had no choice but to overrule and/or take under advisement any motions presented by the government at that time. When all of the evidence was in, the government belatedly moved to strike the testimony of Drs. Morgan and Gofman and any evidence from which their opinions were premised. They have renewed these motions, and at the time of oral argument the government was apprised that this issue would be first addressed in the Court's decision.

*Factual Foundation and/or Its Reliability.* We have discussed certain concepts of scientific certainty and/or reliability, and as may relate to how the scientists reach their decisions. In a court of law, a laboratory for truth, the test is somewhat different. First we look unto a plaintiff to prove reasonably the basis for his case. If he fails here, his case fails. As regards these cases, it is this Court's view that even if a witness is eminently qualified, even if there is merit to his views, and even if F.R.Evid. 702, 703, 704 and 705 are most liberally interpreted, there must be and ought to be some reliable factual basis on which the opinions are premised. This section of the decision is intended to track all of the known evidence as it may apply or should have been applied for the experts' opinions to stand. We start with an understanding that some of the aircraft instruments involved in this case are coated with a radioactive paint, and that each plaintiff has cancer.

Dr. Karl Z. Morgan testified that in his opinion 70% of the instruments were radioactive, although he only assumed that 50% were radioactive when he calculated his dose estimates. (T.Tr. Vol. 5, p. 445). Employee and plaintiff Barbara Womack testified that at least 50% were radioactive. Employee Pat Gaughan wrote a 1980 memo to AID President Alec Fulks, in which he estimated that at least 50% of all surplus instruments received by AID have radium dials. (Ex. 8,067, p. 5). However, this 50% figure refers only to surplus instruments, not to all instruments received by AID, and at the trial Mr. Gaughan testified that ⅑ or 11% of the total instruments in the plant were radioactive. (T.Tr. Vol. 33, pp. 2196–2200).

Drs. Morgan and Gofman seized upon the Gaughan memo as a basis for their findings and actually gave no credence to any other findings. It was in response to the Court's question of witness Gaughan that his more accurate estimate was announced. Any conclusion of Mr. Gaughan that the 50% figure is reliable must be disregarded. From that point on, any findings by these witnesses which were geared to a perception of radiation to this extent were disregarded.

Darrell Murphy, a drug-addicted, incompetent witness, testified that 90% of the government instruments received by AID were radioactive. (Murphy Depo., pp. 54–55). Robert Gallaghar estimated that 50% or more of the instruments he found in AID were radioactive even though he did not conduct a systematic examination of them. (Gallaghar Depo. 7/15/82, p. 172). Dr. Carl Johnson agreed with Mr. Gallaghar. (Johnson Depo., pp. 458–459). Dr. Gofman assumed that 27% of the aircraft instruments at AID were radioactive. (T.Tr. Vol. 10, p. 865). He reaches this by calculating the difference between 5% and 50%. As of that time, the Court pondered how, if only 5%, could it be 27%? More succinctly, how is it that this scientist, however eminent, can so lightly treat such flimsy factual opinions to reach a scientific opinion? As shown later, in the Court's view, it is because these witnesses just aren't that eminent! Alec Fulks, President of AID, who has 32 years of experience in the surplus instrument business, testified

that 4% to 6%, but not more than 10%, of the instruments at AID were radioactive. (T.Tr. Vol. 62, pp. 4964, 4874).

The Court finds here that the estimates which have ranged from 70% to 5% are mostly mere speculation. None of the witnesses actually measured all instruments at AID to determine what percentage were radioactive. Simply said, the only sure way to separate a radioactive instrument from a nonreadioactive one is to measure it with a Geiger counter, and since no one ever actually made the necessary measurements, the actual fact of what percentage were radioactive is not known.

The best actual evidence on this point remains the extensive measurements made by the Geiger and Schmidt U.S. Public Health Service Study in 1966 and 1967. AID was one of the 15 plants in Wichita included in that study, so the results apply to AID and to other similar operations. Geiger and Schmidt found that "approximately 5 percent of the aircraft instruments in facilities surveyed contain radium dials." (Ex. 9507, p. 30). In 1971, researchers Schmidt, Halperin, Geiger, and Livingston published an expanded follow up study which noted:

> Moreover, the problem may be a diminishing one in that most of the instruments that are worth rehabilitating have already had the radium dial replaced with a non-radium dial. Approximately 5 percent of the aircraft instruments in facilities A and C contained radium dials.

Ex. 12,190, p. 13.

This Court finds that the most credible starting point would be the assumption that in 1967 approximately 5% of the instruments at AID were radioactive, and as the years progressed this percentage would be expected to go down, not up. The plaintiffs have the burden of showing by evidence, not by speculation, that the percentage actually increased above 5%. They have not met this burden. When all the testimony is weighed and balanced by the trier of fact on this one point, the Court finds that the various estimates greater than 5% are too speculative to be trustworthy. Consequently, as we shall see later, any dose estimates based upon an assumption that more than 5% of the instruments were radioactive is rejected as mere speculation since those estimates and opinions are not founded upon the actual facts of this case.

Another very important factual matter about these instruments is the total number of instruments in AID while the plaintiffs worked there. This Court once again is faced with little evidence and much speculation. AID did not keep good inventory records so the precise numbers cannot be easily determined. (T.Tr. Vol. 45, pp. 3617, 3618–3620). Estimates given by Barbara Womack, based upon her imaginary walk around the plant, range from 17,756, to 70,525 for the years of concern in this lawsuit. (T.Tr. Vol. 37, pp. 2954–2957). Estimates given by employee Nancy Edwards range from 42,500 to 85,000. (T.Tr. Vol. 36, pp. 2819–2820). The Court permitted these two to relate their opinions as lay opinions (F.R.Evid. 701). Mrs. Womack testified in rebuttal; as plaintiff counsel knows, this was permitted with considerable reservation. How it is that any person can recall literally room by room, shelf by shelf, year by year, any kind of inventory exceeds the bounds of reason! Their testimony was literally rejected as it came in; was patently unreliable; and cries out for some verification. Somewhere in the course of trial, and probably by reason of the Court's concern, the plaintiffs found some records. The Court recalls Exhibit 12,477, wherein Dr. Morgan had anticipated approximately 47,000 instruments. Exhibit 19,185 located in the course of the case identified approximately 15,000 instruments that would have been the maximum available as of that time. Again, if there were 15,000 instruments, where does he get 47,000, and why should he be entitled to rely thereon? Surely a scientist on any project of interest to his peers ought to be embarrassed for having engaged such an unprofessional license. Manager Don Lynch estimated from 7,484 to 48,911. (T.Tr. Vol. 45, pp. 3616–3620). In contrast,

Pat Gaughan testified that there were only approximately 9,000 instruments at AID. (T.Tr. Vol. 25, pp. 2196–2200). John Slater testified that the most instruments at any one time did not exceed approximately 4,000. (T.Tr. Vol. 52, pp. 4172–4173).

Once again this Court must search for some yardstick of reasonableness against which to measure these various estimates. The most precise count of the actual surplus instruments inside AID occurred shortly after the 1981 "Raid on AID." At that time, approximately 1,000 surplus instruments were kept at AID and 4,720 were sent to Alec Fulks, d/b/a Pen Air Parts. (T.Tr. Vol. 62, p. 4875). This makes a total of approximately 5,720 surplus instruments at AID shortly after the raid. This firm number is consistent with the estimates of Alec Fulks (6,000 instruments), Pat Gaughan (9,000 instruments) and Don Lynch (10,000 instruments). It is inconsistent with the eyeball estimates of plaintiff Barbara Womack (17,756 to 70,525 instruments) and Nancy Edwards (42,500 to 85,000 instruments). As stated, the Court is skeptical of the accuracy of an eyeball estimate of numbers as large as tens of thousands of instruments. Consequently, this Court finds as a fact that the number of surplus instruments at AID during the years of concern in this lawsuit must have been in the range of 5,000 to 10,000 instruments. Any larger number is mere speculation unsupported by any credible evidence. The Court notes that Dr. Morgan's dose calculations and opinion rest upon an assumption that there were 50,000 surplus instruments at AID, and Dr. Gofman's dose calculations and opinion rest upon an assumption that there were 43,000 surplus instruments at AID. (Ex. 12,382, p. 41; T.Tr. Vol. 10, pp. 890–891). These two assumptions are speculation, and their use, as an essential element in Dr. Morgan's and Dr. Gofman's dose calculations, renders the results of those calculations mere speculation unrelated to the actual facts of this case.

*Ventilation at AID.* Plaintiffs' expert witness, Dr. Karl Z. Morgan, has testified that 97 to 99% of the dose to two of these plaintiffs came from a "radon cloud" that permeated every nook and cranny of the AID Plant for 14 years. (T.Tr. Vol. 3, pp. 250–261). Two of the radon daughters in this cloud, lead-214 and bismuth-214, would decay in the air, thereby generating gamma rays, some of which would pass through the bodies of these plaintiffs.

In the case of Barbara Womack, Dr. Morgan testified that for 14 years he calculated that this cloud was giving off 14 mrem/hr for each and every hour.[7] (T.Tr. Vol. 5, pp. 533–534, 440). In order to calculate this dose rate, Dr. Morgan had to make certain assumptions. First, he assumed that there were 50,000 total surplus instruments at AID, and that 50%, or 25,000 instruments, were emanating radon gas into the air. This Court has already found that both parts of this assumption are groundless. Second, he assumed that one can validly multiply the radon gas air concentrations measured by Geiger and Schmidt at ACD by a ventilation factor for AID in order to determine radon gas concentrations at AID. This ventilation factor is a comparison of how much worse the ventilation at AID was compared to the ventilation at ACD. In other words, if AID had only one-half of the ventilation of ACD, Dr. Morgan would calculate that the radon gas levels at AID would be twice as high as those at ACD.

There are a number of things wrong with this second assumption, including the fact that if it was true during the years at issue in these lawsuits, it would have been just as true in 1966 and 1967 when Geiger and Schmidt made their actual measurements. Consequently, if AID really had more radioactive instruments and less ventilation than ACD, Geiger and Schmidt would have measured greater levels of radon gas at AID than they measured at ACD. The actual facts show the opposite. While ACD had a measured, not estimated,

---

7. Ironically, if this is so, the finding equates to 28,000 mrem/yr. and exceeds the findings of the Geiger Study, i.e., 500 mrem/yr., by 56 times. (See Ex. 12,189, p. 11).

3.7 MPCa of radon gas, the other facilities, including AID, had less than .3 MPCa of radon gas. (Ex. 9507, p. 10). In other words, AID had less than 1/12 the radon gas of ACD, not more.

Moreover, if, in fact, this "radon cloud" was giving off 14 mrem/hr in every nook and cranny of AID for 14 years, it would be impossible to enter that building with a Geiger counter and record any reading less than 14 mrem/hr! (T.Tr.Vol. 41, pp. 3241–3246). Surely, when witnesses Gallaghar and Johnson came through the plant with their Geiger counters and recorded readings from various instruments and various parts of the plant of an exposure of 14 or even 6 mrem/hr, no readings could have been obtained at all. Understanding this, the propriety of the Gallaghar report loses something in its weight. When Geiger and Schmidt conducted their careful survey of the 15 plants in Wichita, including AID, they found numerous general gamma readings of less than 2 mrem/hr. This would be scientifically impossible if a 14 mrem/hr "radon cloud" really existed at AID. (T.Tr. Vol. 41, pp. 3246–3251). Additionally, the State of Kansas surveyed AID over those years and recorded many levels way below 14 mrem/hr. (T.Tr.Vol. 14, pp. 3248–3251).

Finally, there is no valid reason to select the 3.7 MPCa of radon gas at ACD as a starting point over the less than .3 MPCa of radon gas actually measured at AID. An objective scientist looking for the best data applicable to AID would select the less than .3 MPCa actually measured for AID and the other 13 typical plants and then assume that concentration remained the same over the subsequent years. Throughout Geiger and Schmidt's report it is apparent that ACD was not representative of typical facilities in Wichita for seven reasons.

First, only employees at ACD showed significant body burdens of radium. (Ex. 9507, p. ix). Second, only ACD showed alpha surface contamination as high as 1,630,000 dmp/100 cm $^2$. All other facilities were less than 334,000 dpm/100 cm $^2$. In other words, the highest surface alpha con-tamination at ACD was about 5 times greater than the highest of any of the other plants. (Ex. 9507, p. 6, table 1). Third, ACD radium concentrations in the air were 25% of the MPCa while all other facilities were generally below 1% of the MPCa. (Ex. 9507, p. 8). This means that ACD had 25 times more radium floating around in its air than the other facilities had in their air. Fourth, a large number of radium dials were stored and stripped in Facility C (ACD). This probably accounts for the higher levels measured in this facility. (Ex. 9507, p. 10). Fifth, only the two employees from ACD had elevated levels of radium in their urine. (Ex. 9507, p. 14). Sixth, the average surface contamination at ACD was 50,000 dmp/100 cm $^2$, while the next most highly contaminated facility only had an average surface contamination of 8,000 dmp/100 cm $^2$. (Ex. 9507, p. 16). This means ACD was over 6 times more contaminated than any of the 15 other facilities in Wichita, including AID itself. Seventh, only ACD had painted with radium paint in the past. (Ex. 9507, p. 16).

Obviously, if an objective scientist wanted to estimate the amount of radon gas in the air of AID during the years involved in this lawsuit, the last thing he would do is to select ACD as a representative base point from which to calculate. Common sense suggests that a selection of ACD radon gas levels (3.7 MPCa) rather than the radon gas levels of the 14 other plants (.3 MPCa) as the base line will start a calculation with an assumption that is over 12 times too high. This significant error is mathematically multiplied to an astronomical level by then multiplying the 3.7 MPCa by a ventilation factor of 91. Now one has an assumption of 336.7 MPCa at AID when Geiger and Schmidt actually measured less than .3 MPCa in that very building. With this one single error, Dr. Morgan's calculations of radon gas levels are already 1122 times too high! This Court finds that it is not valid to multiply the radon gas air concentrations at ACD by ventilation factors for AID in order to calculate a hypothetical radon gas concentration at AID.

While Dr. Morgan can use his complex mathematical approach to calculate any dose he wants, his conclusion is obviously scientifically flawed and contradicted by both common sense and available factual data. Therefore, this Court finds that Dr. Morgan's "radon cloud" is a product of his mathematical machinations and a figment of his imagination. It is not a fact.

Nevertheless, this Court will address another factual issue, the number of air exchanges at AID, which formed an essential part of both Dr. Morgan's and Dr. Gofman's opinions. An air exchange is the number of times per hour that the old air in a room is replaced with new air. In estimating huge exposures to these plaintiffs, both Dr. Morgan and Dr. Gofman relied upon Mike Walker's conclusions about the ventilation at AID. If Mr. Walker's conclusions are not correct, then both Dr. Morgan's and Dr. Gofman's opinions must fall.

Mr. Walker is a professional mechanical engineering consultant in Wichita. He simply took the blue prints of AID and used an engineering book known as the ASHRAE Manual to predict or calculate air exchange rates for any given room in the AID building. He made no measurements inside AID and he did not compare the ASHRAE predictions with common sense. It was Mr. Walker's conclusion that although ACD and AID appear to be similar, common buildings for the town of Wichita, the actual ventilation inside AID is from 17.86 to 91 times worse than the ventilation in ACD. (Ex. 12,366, p. 4). This means that the air is exchanged in some rooms only once every 29.7 hours ! (.03367 air exchanges 1 hr = 1 complete air exchange every 29.7 hrs.) (Ex. 12,366, p. 4). Mr. Walker's methodology and formulas came from a book called the ASHRAE Handbook of Fundamentals. His result can be no more precise than this methodology even if his assumptions are correct. This ASHRAE Handbook tells us that Mr. Walker's mathematical methodologies "are simple but are of uncertain precision." ASHRAE Handbook, Ch. 22, § 22.13. (T.Tr. Vol. 44, p. 3499). The ASHRAE Handbook states: "Better precision is possible if house condi-

tion is specifically measured. . . ." ASHRAE Handbook, Ch. 22, § 22.13.

When Dr. Maletskos constructed a model to use in estimating the unmeasured gamma and beta doses these plaintiffs would have received while they worked at AID, he arbitrarily chose to assume that AID had two air exchanges per hour. (T.Tr.Vol. 48, pp. 3864–3865). He made this assumption because two air exchanges per hour is a common figure for houses and other buildings. (T.Tr. Vol. 48, p. 3865). Mr. Gene Hensley and Mr. Dick Smoll were then asked to examine and measure the air inside AID to determine whether or not it had at least the two air exchanges found in a common building. (T.Tr. Vol. 48, pp. 3865–3866). Mr. Smoll is an engineer and Mr. Hensley is an air conditioning contractor in Wichita. They both have extensive practical experience in interior ventilation and they both sit on The Mechanical Board for the City of Wichita. This board governs city building codes and can revoke a contractor's business license. (T.Tr. Vol. 44, pp. 3550–3551).

Mr. Hensley inspected AID to determine how much outside air was leaking into the building through cracks between the walls and the ceiling, and he used smoke to determine whether the air in the building was flowing into the building from one side and out of the building on the opposite side according to the outside wind direction, or whether the air which was moving in the building was just being recirculated. (T.Tr. Vol. 45, pp. 3563–3570). Mr. Walker did not perform such a test. Mr. Smoll, a mechanical engineer, used an air flow meter known as a hot wire anemometer to measure the volume of outside air flowing into the building through cracks around doors. (T.Tr. Vol. 44, pp. 3501–3513). Mr. Walker did not perform such a test. He then computed how many cubic feet of fresh air would enter the building in an hour. When he compared this figure to the cubic feet of air in the building, he could determine whether or not AID had two air exchanges per hour. Both Mr. Hensley and Mr. Smoll testified that in their opinion

there were at least two air exchanges per hour at AID. (T.Tr.Vol. 44, pp. 3508–3509; Vol. 45, p. 3570). Since Mr. Walker testified that in his opinion there was one air exchange every 29.7 hours in part of the AID Plant, this Court is faced with two sets of opinions which are so far apart that only one can be correct. Another expert, Ken Lamson, who measures air exchanges for OSHA "spent a week in the [AID] building crawling around the entire facility, basement, roof, all of the rooms." (T.Tr. Vol. 54, p. 4258). He testified that six air exchanges per hour would be the "normal leakage and infiltration, air leakage in a nontight, older building, which is how I would classify it [AID]." (T.Tr. Vol. 54, p. 4260). The Court is reminded that one air exchange per day is akin to that of a closed closet, i.e., closed, stuffy, with the sense of an odor of paint or clothing. Mindful that some changes have occurred, the Court did tour the facility and perceive it for several reasons. It does not appear stuffy and close, nor should it have been in light of the size of the rooms, ceilings, air vents, doors, etc.

This Court finds as a fact that AID had at least two air exchanges per hour, since that best compares with what is common in buildings, and since this Court finds the methodologies used by Mr. Smoll and Mr. Hensley more credible then the methodology used by Mr. Walker. (T.Tr. Vol. 44, pp. 3512–3513). Plaintiffs have the burden of proving the facts upon which they rely. When they attempt to convince this Court that the ventilation at AID is so abnormally low, they must offer better evidence than a person who applies a mathematical formula of "uncertain precision" to a blueprint and then claims to accurately predict how air actually moves inside this building without making any actual measurements or tests inside that building. Consequently, the Court finds that the air exchanges calculated by Mr. Walker are not established as facts. Therefore, Dr. Morgan and Dr. Gofman have relied upon wholly unreliable facts in formulating their opinions. Since the validity of Mike Walker's air exchange numbers was one of the five essential as-sumptions relied upon by Dr. Gofman, his opinion is now without adequate support. (T.Tr. Vol. 15, pp. 1386–1395). As explained above, the accuracy of the Walker ventilation factors is a key part of Dr. Morgan's formula for calculating doses from the alleged "radon cloud." Since this Court has found those factors inaccurate as a matter of fact, Dr. Morgan's dose calculations must also be rejected as being unsupported by the credible factual evidence in this case. Indeed, Dr. Morgan agreed that if Walker's numbers were wrong, his dose calculations would be wrong. (T.Tr. Vol. 4, pp. 385–388).

*The Facts as to Plaintiff Vessels.* Mr. Vessels was employed as a machinist by AID from October 16, 1978 to December 17, 1980, a period of two years and two months. He was born on May 10, 1910, so he was 68 to 70 years of age during this employment. On August 28, 1979, he was diagnosed as having squamous cell carcinoma of the lungs. This was approximately 10 months after starting employment at AID. On August 9, 1981, he died from lung cancer. (Ex. 19,625, p. 40; Don Vessels' Medical Records, Vol. II, p. 343; T.Tr. Vol. 18, pp. 1545–1550).

Mr. Vessels was a welder and machinist at aircraft assembly plants for 25 years prior to his employment at AID. He was a very heavy cigarette smoker. Medical doctors refer to him as a 50-pack-year smoker, meaning that he smoked one pack a day for 50 years or two packs a day for 25 years. Prior to his employment at AID, Mr. Vessels had a long medical history of cardiopulmonary disease, including pneumonia, pulmonary edema, hypertensive cardiovascular disease, coronary thrombosis, myocardial infarction, and chronic obstructive lung disease. (Ex. 19,625, p. 40; Don Vessels Medical Records). It is noted that Dr. Gray, his treating physician, did not express an opinion as to causation, and Dr. Spann, his treating pulmonary oncologist, was not called as a witness.

*The Facts as to Plaintiff Johnston.* Mr. Johnston worked for AID from August 22, 1977 to September 28, 1979, a period of two

years and one month. Dr. Haffner, who had palpated an enlarged spleen as early as March 1979, and whose records seemingly suggest other symptoms, was not called. His white blood cells were diagnosed as being abnormal and characteristic of a person with leukemia 17 months after he started employment. On July 21, 1979, when he was 53 years old, Mr. Johnston was diagnosed as having chronic myelogenous leukemia. This was one year and eleven months after he started working at AID. Several months prior to the diagnosis of his leukemia, Mr. Johnston suffered from dizziness, fatigue, and bleeding in the tissues around his ankles. These were symptoms of his leukemia. Mr. Johnston died from leukemia on February 17, 1980. (Ex. 19,- 625, p. 22; Earl Johnston Medical Records).

While employed by AID, Earl Johnston's job was to maintain test equipment used for the functional testing of the aircraft instruments produced at AID. He seldom worked on aircraft instruments as such; the only time he would work on an instrument would be to adjust a calibration device on the test equipment to determine if the test equipment was working properly. Mr. Johnston also did some maintenance work, but it was not his primary responsibility. (T.Tr. Vol. 43, pp. 3441–3443).

During the 22 months he was employed by AID, Mr. Johnston worked in two locations. In November 1978, he moved to the new building. (T.Tr. Vol. 43, p. 3443). On occasion there would be one or two aircraft instruments on his work bench to be tested or used to test the equipment. Most of these instruments would be new, the rest would be instruments that had been overhauled. Clemin Sawyer, for whom Mr. Johnston worked, has testified that there were no instruments stored under Mr. Johnston's work bench. (T.Tr. Vol. 43, pp. 3443–3446). Witness Kenneth Magill further contrasts others with his lay opinion. In this regard, the witness knows of no reason why Mr. Johnston would ever be exposed to as many as 12 used aircraft instruments at his work table at one time. (T.Tr. Vol. 52, p. 4125).

*The Facts as to Plaintiff Mewhinney.*
Mrs. Mewhinney was employed by AID from December 5, 1967 to August 22, 1970, and from June 28, 1971 to March 14, 1981, for a total of 12 years and 10 months. Early in 1973 she experienced changes in bowel habits and blood in her stools. On June 21, 1974, she was diagnosed as having adenocarcinoma of the rectum. This was after five years and nine months of employment at AID. On July 17, 1974, she had a partial colon and sigmoid resection and hysterectomy. This was followed with chemotherapy. At present, Mrs. Mewhinney is healthy with no signs of cancer recurrence. (Ex. 19,625, p. 31).

While employed at AID, Mrs. Mewhinney was first assigned to balance rotors. She performed this job at several locations within the plant until she was laid off in 1970. She was called back in 1971 and continued to balance rotors for several months. Then for a period of approximately eight or nine months, she worked on "J–8s" (electric horizons) pursuant to a government contract. (T.Tr. Vol. 34, pp. 2722–2725). Following her return, Mrs. Mewhinney again worked at several locations within the plant. In 1979 she was made a supervisor of the R.C. Allen turn and bank lab. She remained in that position until she quit in March, 1981, shortly after the "Raid on AID." (T.Tr. Vol. 34, pp. 2727–2729).

During the time Mrs. Mewhinney worked at AID, the site of her work place changed frequently—often from floor to floor, from one addition to another. She was unable to recall with any accuracy the time she was at any one location. The instruments that were in storage were also frequently moved from one location to another and were even removed from the building altogether. (T.Tr. Vol. 34, pp. 2767–2768).

In 1974, at the age of 39, Mrs. Mewhinney was diagnosed as having rectal cancer which was surgically removed. The surgery was successful and she returned to part-time work at AID within nine weeks, doing the same job at the same rate of pay; within five to six weeks she was able to

work full time. At the present time, Mrs. Mewhinney carries on a normal life; she can undertake whatever activities she wishes as no doctor has placed any physical restrictions of any kind on her. (T.Tr. Vol. 35, pp. 2670, 2764–2765).

*The Facts as to Plaintiff Womack.* Mrs. Womack was employed by AID from January 5, 1967 to July 5, 1972, and from March 19, 1973 to January 30, 1981, a total period of 12 years and four months. In November of 1974, her thyroid was enlarged, and in May of 1975 it was diagnosed as bilateral goiter. On September 23, 1980, a thyroidectomy was done to remove her enlarged thyroid glands which were both 1 cm or less in diameter. Her left nodule measured 1.1 cm by 0.9 cm, while the right nodule measured 0.9 cm by 0.7 cm. (Womack Medical Records, Surgical Pathology Report; Ex. 19,625, pp. 51–52).

On December 13, 1963, four years before she started working at AID, Mrs. Womack was diagnosed as having cervical cancer. On January 13, 1964, she underwent an abdominal hysterectomy and bilateral salpingectomy. From 1965 to the present, Mrs. Womack has been treated for bursitis, gall bladder disease, functional bowel symptoms, spastic bowel syndrome, bladder symptoms, hip and sacroiliac arthritis, migraine headaches, nervous symptoms, urinary tract infections, incontinence, hammer toes, anxiety hysteria, and anxiety neurosis. (Ex. 19,625, p. 52; Medical Records of Womack). She is shown to suffer from agoraphobia, i.e., fear of the workplace. At the risk of appearing unkind, one must wonder how it can be that given the severity of her condition, that she can so readily assist with the presentation of the evidence. She has followed Gallaghar everywhere and has even been observed moving parts around so that their presence could be noted. (See testimony of Bonnie McDaniel, Vol. 52, p. 4136).

VI. *Application of Scientific Knowledge to the Facts of This Case*

█ We have attempted to signal some of the problems regarding the weight, if any, given to the opinions of Drs. Morgan and Gofman. Indeed, as indicated, the problem is whether either one's opinion is even admissible. It should be abundantly clear that significant aspects of the facts necessary for Dr. Morgan's opinion are wholly missing. This now includes the number of instruments with which we deal and the percentage of those considered to be radioactive. Additionally, the propriety of his dimensions, i.e., ventilation factors, is ignored. With this said, even if those witnesses called to support their factual opinions had been first called, it is doubtful if this Court would have permitted the opinions.

But the problems in this case are more serious, and a solution commences with an understanding of what Gallaghar really said or didn't say. Dr. Morgan places considerable weight upon these findings. The Court has listened to the Gallaghar deposition, a portion of which was videotaped, but most of which is included in reams of transcript. Again, as a layman, when his testimony came in there was no serious reason to be alerted as to so much that *wasn't* said. As indicated, his report makes an alarming case for radiation exposure—it is everywhere! His report of 80 mrem per 14 hour reading is scary. What was not brought out is that this is the same badge that he had continued to wear elsewhere and had not turned in for analysis until weeks later. There apparently were two other badges not identified, and in previous depositions he could not identify then which one he was wearing at the time of his tests. His singular finding in this case is thought by others to be an anomaly. Certainly, in the absence of a negative body burden, other badge readings, including certain secret ones worn by Womack and Mewhinney, no credence is now given to the finding of an 80 mrem reading, and one must wonder why such eminent sorts as Drs. Morgan and Gofman would so readily apply credence to this most superficial finding. Admittedly, Dr. Gofman agrees that "it's worrisome," but not worrisome

enough to stake his good name to this opinion.

These witnesses were surely aware of other findings, although not reported in their respective reports. By example, no air samples were taken by Mr. Gallaghar, a must in the interest of professional proficiency. His audioradiograph was impressive; indeed, the Court challenged the government to test its relevancy, and to the Court's surprise, they did. Witness Auxier reproduced similar audioradiographs from a lantern mantle, a dish, and an aircraft instrument part, all of which similarly revealed the presence of radiation—no more.

Now the likes of Mr. Gallagher, Dr. Morgan and Dr. Gofman know better, and in the Court's view they have misled the Court. In every event, Gallaghar's testimony and his report are disregarded as being professionally unreliable.

Dr. Johnston's findings are also collectively considered by the experts, and in addition, he has asserted an independent opinion as to the causal connection. In fairness to him, his testimony is presented through a series of depositions, much of which were adduced in the discovery process by at least 10 very skilled lawyers. It is most difficult to reconstruct or keep straight just exactly what this witness has said, or is saying. Paramount in the Court's mind, however, is the fact that he apparently commenced his findings with an assurance that the plaintiffs' body burdens were positive. He has agreed that they probably should be reported as such, because of the absorption factors discussed herein. He testifies here, after his opinion has been drafted, and he seemingly grabs for some valid basis for his findings; he finds himself in trouble, and his testimony is accepted for what it is worth. For additional reasons set forth in later portions of this opinion, his opinion is *not* worth much, nor is it considered with regard to the probative weight of the plaintiffs' case.

Returning to other important findings of Dr. Morgan, some comment is in order as to the nature of his report. A review of his testimony will reveal that it is a most complicated set of formulas and concepts, which are difficult for a layman such as this factfinder to readily understand. His report, contained in a partially handwritten, multi-page instrument, was never explained or even addressed, but was simply handed up. The Court has attempted to digest its content and can simply say that it may just as well have been reported in Greek. It is only through other witnesses' references to it, and their explanations of it, that it is actually understood. Most assuredly, any scientist who happens to review this decision is welcome to review Exhibit 12,382, being the report of Dr. Morgan, with some assurance from the Court that their conclusions will be the same, i.e., Greek!

As stated, Dr. Morgan's measurements of the instruments read in the amount of 26 microcurie. Dr. Auxier's measurements are 3.5 microcurie, and Dr. Maletskos' are 3.65 microcurie. Aside from the fact that Dr. Morgan measured only seven as opposed to all 10 of the instruments at hand, his procedures are suggested to be wholly unorthodox and not in conformity with any acceptable means unless he was simply measuring with the intention of finding all the exposure he could support. From the teachings in these cases, it is doubtful that Dr. Morgan's measurement of the radiation content of the instruments should have been taken while the instruments were enclosed in a plastic container; rather they should have been ventilated and then measured as Drs. Auxier and Maletskos have described. Dr. Morgan's method would simply retain radon. The instruments should not have been measured on a flat concrete floor, as this produces a "scattering" effect, and the Court now understands the immerse square law, which is applicable here. The beta rays, by all means, are to have been first screened out; Dr. Morgan did not do this. It is now understood that at least 70% of the radiation is retained in the instrument; Dr. Morgan has measured all of it.

Dr. Morgan's method of measuring the radiation content of the instruments is best reviewed in comparison to Dr. Maletskos'

and Dr. Auxier's approach to the measurement of the radiation emission. The Court accepts Drs. Maletskos and Auxier's method as wholly objective, honest and reliable. As to Dr. Morgan's procedures, if this man were reporting his test results for anyone other than a jury or this Court, he would become an immediate laughing stock! In the Court's view, Dr. Morgan is perhaps an esteemed scientist of yesterday trying to hold on to whatever reputation remains. He has baffled his old friends and those far better trained. He is, in the Court's view, a pathetic figure who can better serve the field by simply "going home." Dr. Morgan's testimony is stricken from this case as totally unreliable.

It follows that inasmuch as Dr. Gofman and all others relied upon the findings and opinions of Dr. Morgan, their testimony should also fail. Dr. Gofman makes it clear that he relies on other facts somewhat independent of Dr. Morgan's approach. This Court has traced the witness' testimony and recited the factors. In light of all that has been said here, the Court disagrees with the basis on which Dr. Gofman has made his opinion and will ignore it in its entirety. Doubtless this will offend the sensitivities of this most confident witness; notwithstanding that, the Court knows now that no matter what esteem he claims, he is *not* a certified health physicist, and while a physician, he does *not* examine or treat patients. He enjoys emeritus status at the University of California at Berkeley, but has *no* office, nor access to any laboratory or library, and he teaches *no one*! From what this Court can garner, it appears that his principal activities are writing books and testifying in the courtroom.

The Court has made the foregoing findings principally in light of the absence of reliable or significant evidence on which they premise their opinions, and because this Court believes that both of these witnesses are unreliable. Under the circumstances noted, in the event someone should disagree with the Court's findings at this point, there are other reasons.

At the heart of this case is the question of what amounts of radiation are potentially dangerous enough that people should be protected from such exposures. This question was a subject of scientific concern back in 1927 when Dr. Lauriston Taylor helped found the ICRP. (T.Tr. Vol. 63, p. 4933). Since then, the group of scientists who have specialized in examining this precise question have been known as the radiation protection community. (T.Tr. Vol. 63, p. 4988). Although this group now numbers about 6,000 to 10,000 scientists, Dr. John Gofman has never been an active member of the group because he has never made any significant contributions to this field and because his writings on the subject have not been found to be scientifically credible by the radiation protection community. (T.Tr. Vol. 63, pp. 4988–4990; Vol. 41, pp. 3281–3282). Dr. Morgan was once a contributing member of the radiation protection community. In fact, Dr. Lauriston Taylor appointed him to the chairmanship of ICRP Committee II. (T.Tr. Vol. 63, p. 4954). However, Dr. Morgan was later removed for cause and he has not been an active participant in the radiation protection community for the last decade. (T.Tr. Vol. 63, p. 4954). The most eminent scientists in this international radiation protection community are the people who have been selected to serve without compensation on committees which were formed to write reports that would summarize the most knowledgeable scientific consensus about the actual risks of radiation. These people served on ICRP, wrote ICRP reports, served on NCRP, wrote NCRP reports, served on BEAR, wrote BEAR reports, served on UNSCEAR, wrote UNSCEAR reports, served on BEIR, and wrote BEIR reports. Dr. Morgan has testified under oath on numerous occasions that these scientists are all biased and that he alone is objective and independent. (T.Tr. Vol. 3, pp. 289–292).

The Court finds that the next reason why the opinions of Dr. Morgan and Dr. Gofman must be rejected is because neither man represents the views of the vast majority of competent, respected scientists in

this field. Rather, Dr. Morgan and Dr. Gofman represent the views of an extreme minority of scientists. This is not a situation where the scientific community is equally divided between two respected schools of thought. It is a case where there is a very small, but yet very vocal, group of scientists, including Drs. Morgan and Gofman, that holds views which are not considered credible by the experts in the field. (T.Tr. Vol. 41, pp. 3281–3282).

The next reason why Dr. Morgan's and Dr. Gofman's views on the health risks of ionizing radiation are rejected by this Court is because neither man has ever served on national committees chosen to address this very question. From 1956 to 1963, the National Academy of Sciences chose the most eminent scientists in this field to serve on committees to study the biological effects of atomic radiation. (BEIR III, p. 7). Those committees published numerous reports known as the BEAR Reports. (BEIR III, p. 7). Neither Dr. Morgan nor Dr. Gofman ever served or was asked to serve on a BEAR Committee. In 1955, the United Nations established the U.N. Scientific Committee on the Effects of Atomic Radiation (UNSCEAR). (BEIR III, p. 8). UNSCEAR has issued many reports on this issue, including the 1977 UNSCEAR Report and the 1972 UNSCEAR Report. Neither Dr. Morgan nor Dr. Gofman served on or was even asked to serve on these international committees. In 1964, the National Academy of Sciences established a Committee on the Biological Effects of Ionizing Radiation. That BEIR Committee has issued three reports: BEIR I, BEIR II and BEIR III. (BEIR III, pp. 8–9). Neither Dr. Morgan nor Dr. Gofman served on or was asked to serve on these committees.

The next reason why the opinions of Drs. Morgan and Gofman must be rejected is because not only have they never served on any of these extremely relevant committees, but also neither one has accepted the consensus reports of these committees as reliable authorities. (T.Tr. Vol. 3, pp. 286–290); Radiation and Human Health, pp. 314–323). It is not this Court which has chosen to separate Dr. Morgan and Dr.

Gofman from the vast majority of respected radiation scientists. They have chosen to separate themselves by rejecting as reliable authorities the very documents which represent the scientific consensus in this particular field.

Next, this Court must reject the testimony of Dr. Morgan and Dr. Gofman because they have become advocates for a cause and have therefore departed from the ranks of objective expert witnesses. Dr. Morgan claims that the recognized authorities such as UNSCEAR, BEIR, NCRP and ICRP are all wrong because the scientists serving on these committees have some vague connection with government grants. (T.Tr. Vol. 3, pp. 289–292; Vol. 5, pp. 480–485). Dr. Morgan claims that he alone is "completely independent" and objective. (T.Tr. Vol. 3, p. 20). Yet Dr. Morgan is working on about 50 radiation cases, and in each he is the plaintiff's expert witness. Indeed, given his $500.00 per day expert witness fee, one must wonder who is partisan! The Court finds that Dr. Morgan has become a professional plaintiff's expert witness in radiation cases, and has identified himself so closely and so consistently with the plaintiff's side in these cases that his testimony must be seen as lacking in credibility due to this obvious bias.

Dr. Gofman's demeanor in court shows that he is an open advocate for the argument that radiation is more harmful than all the world's experts believe. In his book, Dr. Gofman admits that there are "sharp differences" between his risk estimates and those of BEIR and UNSCEAR. *Radiation and Human Health*, p. 314. Then he hints to the dark motives or general incompetence of the world's eminent radiation scientists who are "grossly misusing the evidence in their analysis." *Id.* He refers to BEIR III as a "shocking mishandling of scientific evidence," and claims that some of its procedures "can be rejected out of hand." *Id.* at p. 315. Moreover, he claims that parts of BEIR III are arbitrary and "without scientific foundation." *Id.* at p. 318. Dr. Gofman casts aside the 1977 UNSCEAR Report with this comment:

[T]he author considers that the UNSCEAR analysis can hardly be taken as a serious effort to assess the true risk of cancer from population exposure. In most respects, the UNSCEAR analysis is even less satisfactory than the BEIR III analysis, which is itself seriously flawed.

*Id.* at p. 323. This Court cannot believe that all of the most eminent radiation scientists in this country and the entire world are as incompetent as Dr. Gofman claims, and that only Dr. Gofman has been able to define the true risks of radiation. This Court does find that Dr. Gofman's dramatic conflict with all of the world's radiation experts creates a bias in him which destroys his credibility as an objective expert witness in radiation cases. His obsession blinds his objectivity!

■ This Court must also reject the testimony of Drs. Morgan and Gofman because they both use unreliable statistical methods which are not those commonly used by this field of science. Kansas law requires that causation must be proven to a reasonable degree of medical certainty. *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 662 P.2d 1214, 1221 (1983). *See also Zerr v. Trenkle*, 454 F.2d 1103, 1106 (10th Cir.1972); *Nunez v. Wilson*, 211 Kan. 443, 507 P.2d 329, 334 (1973). A statistical method which shows a greater than 50% probability does not rise to the required level of proof. *Fitzgerald v. Manning*, 679 F.2d 341, 356 (4th Cir.1982); *O'Connor v. Industrial Commission*, 19 Ariz.App. 43, 504 P.2d 966 (1973); *Garner v. Hecla Mining Corp.*, 19 Utah 2d 367, 431 P.2d 794 (1967). A simple review of Dr. Morgan's lengthy report and Dr. Gofman's book clearly shows that their analysis that these plaintiffs' cancers were caused by radiation at AID is not a medical opinion but is statistical sophistry.

Dr. Morgan is not a medical doctor and he admits that he cannot give any medical opinions. (T.Tr. Vol. 2, pp. 232–233). He also admits that radiation-induced cancer can only be observed statistically. (T.Tr. Vol. 4, p. 393). He admits that his formula, the probability of causation equation, is not yet accepted or used by any of the national or international bodies of experts who have studied this problem. (T.Tr. Vol. 5, pp. 456–457, 478–479). This Court realizes that the probability of an event happening cannot fall below 0% (impossible) or rise above 100% (certain), yet Dr. Morgan uses his statistical methods to calculate a 4,832% and a 6,391% chance of these plaintiffs getting a specific type of cancer in the future due to radiation received in the past. (T.Tr. Vol. 5, pp. 457–458). If this Court were to accept Dr. Morgan's statistical approach to causation, then this Court would have to find that plaintiffs have proven by 63 times certainty that past radiation has caused specific types of cancer which, in fact, they do not have! If Dr. Morgan's statistical approach to causation in this case can prove by 63 times certainty that radiation has caused something which does not exist, then plaintiffs in a radiation case can recover for suffering from imaginary diseases. This Court finds by common sense that any statistical method which fails to include some obvious possible causative factors must yield a seriously flawed and untrustworthy end result. This Court finds that Dr. Morgan's complex mathematical machinations do not constitute reliable expert testimony on the issue of whether or not radiation at AID caused these plaintiffs' cancers.

By using the probability of causation formula, Dr. Morgan testified that the probabilities of radiation from AID causing these four plaintiffs' cancers ranged from 76.7% to 99.7%. (Ex. 12,382A). By using exactly the same formula, Dr. Fabrikant testified that the correct probabilities were from .01% to 3%. (T.Tr. Vol. 64, pp. 5223–5224). Once again the offered scientific testimony presents an unbridgeable gap.

Dr. Fabrikant explained to the Court how a statistical approach like the probability of causation lends itself to backward calculation. If the witness simply manipulates the input numbers, he can come out with a predetermined result. In other words, Dr. Morgan could simply do a lot of figuring to see how strong a case he could build or

develop for the plaintiffs. (T.Tr. Vol. 5, pp. 469–524). In fact, Dr. Fabrikant explained how a biased witness could simply inflate two essential terms of the formula, the BEIR III risk coefficients, and the plaintiffs' doses, in order to yield a very large probability of causation. (T.Tr. Vol. 64, p. 5225). While this Court cannot describe Dr. Morgan's motives, this Court does find that he has done exactly as Dr. Fabrikant explained. Dr. Morgan has presumptuously inflated the BEIR III risk coefficients and he has incorrectly calculated huge doses for each plaintiff. Consequently, it was predetermined that his end result would be almost 100% causation. In contrast, Dr. Fabrikant's use of this same formula was based upon BEIR III risk coefficients and upon the doses calculated by Dr. Maletskos, so that Dr. Fabrikant did not "adjust" his input figures in order to get an "output" that pleased his client. This Court finds that the statistical probability of causation formula as used by Dr. Morgan does not constitute an opinion on causation to a reasonable degree of medical certainty, but rather constitutes mere speculation at best and deception at worst. Since Dr. Morgan's whole causation testimony is based upon this statistical sophistry and mathematical machination, it must be rejected.

Dr. Gofman's methodology is also a statistical analysis, not a medical opinion. He testified at trial that his opinion was exclusively based upon mathematical computations. (T.Tr. Vol. 15, pp. 1307–1308). At page 127 of his book, *Radiation and Human Health*, Dr. Gofman admits that his methodology will produce only "some imperfect estimate," and on page 617 he admits that "we cannot ever hope to tell which cancers are radiation induced and which are not." Moreover, he admits that his statistical method is only accurate to plus or minus 50% if he starts with an accurate dose, but that in this case he does not even have accurate doses as a starting point! (T.Tr. Vol. 15, p. 1353).

Finally, Dr. Gofman's book proves that his analysis is not medical at all, but is only statistical. It "contains many numbers" (p. 1); "numbers are necessary" (p. 2); "the

reader will encounter many tables" (p. 8); "when we refer to radiation as a cause … we make this proof by statistical observation" (pp. 54–55); "radiation is only one of a number of causal agents" (p. 102); "our objective in this book is to develop a quantitative estimate" (p. 102); "if we wish to calculate the total number of extra cancer deaths produced" (p. 118); "the chances are 38.3 out of 100" (p. 348); "if 10 persons each ingest 31.25 microcuries of 226 radium they will develop 1 fatal bone cancer among them, but we cannot say in which person" (p. 433); "the authors estimate that plutonium particles have already committed approximately 950,000 persons worldwide to a lung cancer death" (p. 495); "Table 56 provides data which permit calculations for exposure at ages 11 all the way back to infancy, so that it is useful for medical-legal issues" (p. 618).

The Court finds that Dr. Gofman's approach in his book, and his testimony in this case, are not opinions to a reasonable degree of medical certainty, but rather, are bare speculative, statistical analyses masquerading as medical opinions. Furthermore, Dr. Gofman's opinion depends upon the accuracy of Dr. Morgan's doses and upon the accuracy of Dr. Gofman's risk coefficients which he admits are 54 to 38 times higher than the risk estimates found by the BEIR and UNSCEAR committees of eminent radiation scientists. (*Radiation and Human Health*, p. 314). To accept Dr. Gofman's opinion would require this Court to reject the consensus of the world's radiation experts. This Court simply cannot believe that all of these scientists are so wrong, that Dr. Gofman alone is right, and that all of the other scientists in the world are so biased that they refuse to accept the "truth" once Dr. Gofman has revealed it to them in such a simple way that "anyone who can understand miles per gallon, dollars per pound, or 18% interest on your unpaid balance can understand every bit" of it! (*Radiation and Human Health*, p. 2).

The next reason why this Court rejects the opinion testimony of Drs. Morgan and

Gofman is because they construct their analyses to reach a predetermined result and will readily discard prior statements that do not suit their present argument for the plaintiffs in this case. The Court has reviewed how Dr. Morgan's statistical analysis allows him to play with numbers of his own invention until he achieves a predetermined result. Dr. Gofman's opinion also rests upon numbers of his own invention. It is particularly telling that these numbers stand in sharp contrast to the consensus of the rest of the world's radiation scientists. Also, when confronted with clear statements in his book which rule out radiation induction on the facts of this case, Dr. Gofman either disavows those statements or he makes a new "world discovery" to reconcile the conflict. (T.Tr. Vol. 6, pp. 551–555). This Court finds that throughout their lengthy reports and testimony, both Dr. Morgan and Dr. Gofman were very adroit at readily discarding any facts which would discredit their predetermined result. The Court has mentioned one simple example, being their use of an AID film badge and whole body count data. In order to support their argument about the normal working conditions at AID, they both ignore a large number of whole body counts and film badges in order to rely upon one single whole body count and two single film badges, one of which went through a washing machine, and the other of which Mr. Gallaghar wore elsewhere. The Court finds that Dr. Gofman and Dr. Morgan exhibit a deliberate propensity to ignore a large amount of well-established data which negates their arguments, and they cling to a small amount of highly questionable data which supports their arguments. This is not the hallmark of the type of objective scientist which a Court can rely upon in a lawsuit. It is the hallmark of a professional witness who is biased toward one side of the case.

Next, this Court rejects the opinion testimony of Dr. Morgan and Dr. Gofman because they both evidence an intellectually dishonest invention of arguments to protect their opinions. One example is the solubility of radium-226 in the human body.

There is no question that the world censensus is that 20% of inhaled or injected radium-226 paint will be absorbed into the blood and eventually much will be deposited in bone. Consequently, any significant inhalation or ingestion of radium-226 will be scientifically observable on whole body counts all during and even after the person's life span. In this case, there can be absolutely no disagreement with the fact that the whole body counts of these plaintiffs show no more radium-226 in their bones than in their lawyer's bones. What do Dr. Gofman and Dr. Morgan do in the face of these facts, which absolutely disprove any significant inhaled or ingested dose from radium-226? They invent the argument that this particular radium paint is insoluble because each particle in the air is coated with plastic. Dr. Morgan apparently forgot that his own health physics textbook unequivocally states on page 348 that this paint is soluble in the human body. (T.Tr., Vol. 1, p. 271). Likewise, he apparently forgot that his own ICRP No. 2 unequivocally states at pages 221 and 14 that this radium paint is soluble in the human body. (T.Tr. Vol. 3, pp. 268–273). Dr. Gofman thought his plastic invention solved the whole body count problem until he realized that if alpha particles can only travel 50 minus, this plastic coating would create a zero dose to Lila Mewhinney's colon. Then he conveniently decided that his plastic coating just happened to be about 10 microns thick. (T.Tr. Vol. 14, pp. 1257–1266). For all Dr. Gofman's speculation about polymerization, the plaintiffs have totally failed to provide this Court with any scientific evidence for their argument that the world consensus is wrong on the facts of this case. Consequently, the Court finds that the radium paint at AID was soluble in the human body and that Dr. Morgan's and Dr. Gofman's arguments otherwise are simply speculation.

The next reason why this Court rejects the opinions of Drs. Morgan and Gofman is because neither is actually an expert in the particular radionuclide, radium, which is at the very heart of this case. (T.Tr. Vol. 47,

p. 3720). Neither Dr. Morgan nor Dr. Gofman participated in the radium dial painters study; in fact, neither man has ever published a peer-reviewed paper of original research on the topic of radium in man. (T.Tr. Vol. 2, p. 236; Vol. 47, p. 3720). Both men's knowledge about radium depends upon the research of other scientists like Dr. Robert Rowland. (T.Tr. Vol. 2, p. 236).

As a trier of both fact and law in this FTCA case, this Court must determine which expert witnesses are more credible and trustworthy than others. The previous reasons for rejecting the testimony of Drs. Morgan and Gofman are intended to be *illustrative* rather than *exhaustive*. This is an extremely complex and detailed case involving many more points than can be explained even in an opinion as lengthy as this one. The reasons this Court has given for rejecting the testimony of Dr. Gofman and Dr. Morgan are simply provided to help explain the Court's rationale, to educate the litigants, apprise the experts, and provide some insight for other courts which must face these same two witnesses and must assume the same task of determining whether Dr. Morgan and Dr. Gofman represent a valid scientific point of view.

As addressed earlier herein, the Court has noted that the United States seemingly acquiesced in the testimony of these two witnesses, somewhat to the Court's displeasure. What was not said then, but then perceived by the Court and clearly understood now, was that however time consuming, expensive, and oftimes frustrating this trial has been for all parties concerned, the plaintiffs' claims are simply secondary to the interest of the United States. The paramount and obvious overriding interest has been to "put to rest, once and for all, the likes of Drs. Gofman, Morgan and Johnson." If there has been any other reason to detail the Court's findings on these witnesses, it is in part to now support the United States' concerns.

To repeat, these experts' conclusions are not supported by any fact other than that the instruments are coated with a radioactive paint and each plaintiff has cancer. Beyond that there is nothing! Further, the factual data is inaccurate, incomplete, and is the product of rank speculation. The findings are unreliably assessed and professed by the most partisan, unfair sorts this Court has ever observed. Although not privy to other proceedings such as *Silkwood* and *Allen,* in which each of these witnesses has participated, it appears that in the absence of well-prepared, skilled counsel or in the absence of such superb witnesses as those who addressed the issues here and have testified in language a layman can understand, it is no wonder that these two have been successful under those circumstances and that their testimony is sought in a goodly number of plaintiff cases now pending across the country. This Court is disappointed with the apparent fact that these so-called experts can take such license from the witness stand; these witnesses say and conclude things which, in the Court's view, they would not dare report in a peer-reviewed format. It has been as if no one else is listening. Care has been given to report as accurately as possible what they have said and the basis on which they formed their conclusions, principally in the face of what is actually known and accepted in the field of health physics science. As to other members of the scientific world who have focused on these cases, the Court believes those scientists will find the Court's decision and findings fairly reasoned and scientifically sound; they needed to be said.

*Rejection of Drs. Johnson, Moore and Padgett.* Each of these witnesses has taken into account the findings on which Drs. Morgan and Gofman have founded their opinions as well as the testimony of both Morgan and Gofman. As stated above, the Court has rejected into the testimony and conclusions of Drs. Morgan and Gofman. As a consequence thereof, it follows that the testimony of each of these witnesses, Johnson, Moore and Padgett, must also be rejected, because it is founded upon the conclusions of Drs. Morgan and Gofman. There are additional reasons, however, which are deserving of comment.

As to Dr. Johnson, this Court must view plaintiffs' "Raid on AID" evidence with considerable skepticism for an entirely different reason. Dr. Morgan told this Court in no uncertain terms that 97.6% of Mrs. Womack's dose was from radon gas at AID, and that 99.9% of Mrs. Mewhinney's dose was from radon gas at AID. On February 17, 1981, the plaintiffs filed a motion with this Court to obtain a court order allowing them to make an unannounced inspection of AID in order to allow their experts, Dr. Johnson and Mr. Gallaghar, to collect evidence. The Court granted that motion based upon the representation of Barbara Womack that if given notice of the inspection, "there is a strong probability that further attempts to destroy or conceal the evidence would take place." (Womack Affidavit). In the motion itself, plaintiff counsel represented to this Court that they wanted to collect "those items of physical evidence located in AID as specifically set forth by the affidavit of Carl Johnson." In his supporting affidavit, Dr. Johnson represented to this Court that among the things he planned to do in an unannounced "Raid on AID" were "tests of the radon daughter concentration in the working environment." (Johnson Affidavit supporting 2/17/81 motion). Yet, when it came time to offer the results of these tests at trial in order to provide some factual basis for Dr. Morgan's dose calculations, they were nowhere to be found. It is obvious from this Court's personal observation of all of the photographs taken during the raid, and from this Court's observation of Dr. Auxier's demonstration of such a radon daughter test in this courtroom, that Dr. Johnson had plenty of time to perform the test he claimed he wanted to do. It is also perfectly obvious to the Court that the techniques and devices available were extremely portable. In fact, the National Bureau of Standards had been performing radon gas tests with portable equipment 40 years ago. (T.Tr. Vol. 63, pp. 5032–5039).

Dr. Carl Johnson did not, in fact, even attempt to measure radon gas at AID during the raid, in direct contradiction of his affidavit. Since Dr. Morgan says radon gas, and not surface alpha contamination, caused 97.6% and 99.9% of the dose to the two plaintiffs who worked there the longest, this Court must find Dr. Johnson's refusal to measure radon gas incompetence at best and deception at worst. Moreover, all of the photographs and Geiger counter measurements of surface alpha contamination that Dr. Johnson represented to this Court as a huge health problem are meaningless because Dr. Morgan tells this Court that what Dr. Johnson really measured only accounted for 2.4% of Barbara Womack's dose and .1% of Lila Mewhinney's dose. Although neither Dr. Johnson nor Mr. Gallaghar even attempted to measure for radon gas during the raid, Mr. Gallaghar did return in June of 1981 and attempt to measure radon gas in the Jones Building, a separate part of AID where none of these plaintiffs ever worked. (T.Tr. Vol. 9, p. 348). Although these readings may not be directly applicable because they were taken in another building, even these readings from this second entry at AID for the purpose of gathering relevant evidence are not available because, as plaintiffs' counsel represents to this Court, Mr. Gallaghar "messed the tests up ... they aren't worth a darn." (T.Tr. Vol. 4, p. 351). As this Court sees it, counsel's characterization aptly describes all of Dr. Johnson's and Mr. Gallaghar's "evidence" collected during the "Raid on AID."

Although Dr. Johnson did not appear in this courtroom to defend his actions, he was perfectly willing to give opinions in the matter from the relative safety of a discovery deposition. At that time he indicated that he was willing to give an opinion that causation existed if someone received a yearly dose of 450 mrem. (Johnson Depo., Vol. 1, p. 152). The Court finds such a position absurd, since the international and national experts in this field have unanimously agreed that safety standards for workers can be set at 5,000 mrem per year, and that safety standards for any member of the general public can be set at 500 mrem per year. In order for this Court to credit the rationale of Dr. John-

son, this Court would have to ignore the international and national scientific consensus on this point. Plaintiffs have failed to show this Court why it should believe that Dr. Johnson is right and all of the eminent world experts are wrong.

On the question of latency periods, Dr. Johnson testified at deposition that radiation-induced leukemia had a 6-month latency period prior to diagnosis. (Johnson Depo., Vol. 1, pp. 207–208). Once again, this shows that Dr. Johnson has distanced himself from scientific consensus. BEIR III tells us that leukemia has a minimal latency period of two to three years. (BEIR III, p. 353). BEIR III also tells us that for chronic granulocytic leukemia in a person exposed after age 30, the facts of Earl Johnston's case, the Atomic Bomb Casualty Commission data tells us that the minimum latency period is about over five years, and the average latency period is just under ten years. (BEIR III, p. 339, figure A–4; T.Tr. Vol. 64, pp. 5239–5240). Once again, either Dr. Johnson is correct or the rest of the world is correct. This Court has no faith in Dr. Johnson's opinions. His work in this case and the opinions he expressed did more to confuse the issues than to clarify them.

Perhaps some of the reasons Dr. Johnson's opinions are of no value are because he is not a certified health physicist. (Johnson Depo., pp. 268–269); he has only had one year of college physics (Johnson Depo., p. 433); he is not actively teaching any related subjects (Allen Tr., p. 3003); he never had an office medical practice (Johnson Depo., p. 90); he had to resign from his position as director for the Jefferson County Department of Health in order to avoid being fired (Johnson Depo., pp. 321–323); he does not own basic health physics equipment (Johnson Depo., p. 272); the Raid on AID survey was the first such survey he has even attempted (Johnson Depo., p. 39); and he failed to attempt to measure what Dr. Morgan claims caused 97.6 to 99.9% of

the dose to two plaintiffs. Just because someone has obtained a general medical degree, that hardly makes him competent to express opinions as to whether or not radiation caused a certain cancer.

Dr. Dennis Moore is perceived by the Court as a well-regarded and wholly qualified hematologist and oncologist of this city. Earl Johnston was his patient, and his diagnosis of chronic myelogenous leukemia, Philadelphia negative, is not disputed. Geared to his understanding of the patient's exposure, he has assessed the event as a likely cause for this condition. There is legitimate dispute on this, of course, including the ramifications regarding the time of the first exposure or the time when the cancer was initiated. In this regard, the aspects of latency and the concepts of doubling time are in issue as well. He has also concluded that Vessels' squamous carcinoma is causally related to the exposure. He does so in the face of all of the patient's other problems, including the fact that he was a heavy cigarette smoker. In his view, this habit simply serves as a carcinogenic aspect. In other words, it acts together to produce the whole or an aggravated result.

Now, as found, the relevant and/or reliable evidence for any of his opinions is lacking here. Notwithstanding that, he has premised his reasons for his opinions that the radiation caused these cancers without regard to the doses involved, because he believes that any radiation, "however slight," above background radiation causes cancer. (T.Tr. Vol. 22, pp. 1868–1869).[8] This approach is troubling, and in light of the Court's respect for the witness, his good intentions deserve comment.

BEIR III tells us that the committee of national experts on this precise subject "does not know whether dose rates of gamma or x-rays of about 100 mrad per year are detrimental to man." (BEIR III, p. 3). Also, the safety standards for workers are set at 5,000 mrem per year or 5 rem per year, and the safety standards for any sin-

8. Dr. Johnson has established or standardized background here as between .002 and .005

mrem/yr. (See Depo. July 15, 1981, at p. 92).

gle person in the general public are set at 500 mrem per year. (T.Tr. Vol. 63, pp. 4940–4941, 4946–4953). If Dr. Moore's belief that any radiation "howsoever slight" above background radiation is the medical cause of a person's cancer, then these international experts would not have set safety standards at 5,000 mrem per year for radiation workers. For this Court to accept the rationale behind Dr. Moore's opinion would require the Court to reject the consensus of eminent radiation experts.

Additionally, the Court has heard evidence regarding the effects or significance of background radiation and its variance across the country. The Court has reviewed those articles on findings in China and India and must conclude that the witness' rationale is at least mistaken. Certainly, if he were correct, and as suggested by others, this community and others would be in a state of constant epidemic. With due respect to Dr. Moore's opinion, the Court finds that it is simply without a reasonable medical or scientific basis.

Accordingly, and for all of the reasons stated above, the Court finds that the plaintiffs have wholly failed to meet their burden of proof as to whether exposure to any amount of ionizing radiation has caused or contributed to the plaintiffs' injuries.

## VII. Defendant's Case

In light of the foregoing findings, this case is essentially over and could be dismissed without further comment. Notwithstanding that fact, however, comments are in order as to the defense of this case. As indicated herein, the United States is deserving of the Court's views and findings as regards its role, if any, in the plaintiffs' plight. For reasons detailed here, the overwhelming evidence presented in this case suggests that there was none. The defense, of course, is presented through an orderly presentation of numerous experts in the varied fields. While the Court will take some care to resume the testimony of these witnesses, the Court has no hesitancy in saying here that each, in his own field, has had more training and experience than any of those produced for plaintiffs. Collectively, these witnesses have literally obliterated the plaintiffs' cases.

Dr. John Auxier is an eminent health physicist who has specialized in matters of radiation dosimetry. He calculated the doses to the Japanese who survived the first two atomic bombs and he made numerous field tests of atomic bomb doses during the atmospheric testing in the United States. He has been President of the Health Physics Society, is a member of the NCRP, and succeeded Dr. Morgan as Director of Health Physics at Oak Ridge National Laboratory. His testimony was most helpful and enlightening. This man came to teach. In every respect his testimony appeared most sensible, believable, persuasive, enlightening and helpful.

Dr. Constantine Maletskos has a PhD from M.I.T. with three majors. This is equivalent to having three PhD's, and Dr. Maletskos is the only person to achieve this in the history of M.I.T. He is a brilliant man with a broad scientific background relating to radiation. Most important, he has measured and/or calculated doses for thousands of dial painters involved in the radium dial painters study. (T.Tr. Vol. 47, pp. 3719–3722). Consequently, when it comes to reconstructing the most probable dose these plaintiffs received while employed at AID, Dr. Maletskos is the most qualified to do that job accurately. The Court was impressed with his models and reasoning. See Exhibit 19,190. As indicated previously, his objective basis for measurements has been accepted as reliable, and this finding is reiterated here. (T.Tr. Vol. 47, pp. 3793). His examples of comparative study between his findings and those of Dr. Morgan were most impressive and logical, and for many reasons served to discount anything Dr. Morgan said. (T.Tr. Vol. 47, p. 3763).

Dr. Eugene Saenger also has had a long and eminent career as a doctor who uses radiation in the treatment of cancer as well as a doctor who has served on national committees for radiation protection. His medical subspecialty is radiology and nuclear medicine. Thyroid cancer has been of

special interest to him. He is presently the Director of The Eugene L. Saenger Radioisotope Laboratory at the University of Cincinnati Medical Center. He is eminently qualified to give medical opinions in this case, each of which is accepted as realistic and sound. Actually, when this gentleman stepped down, the Court commented that it appeared the defense had fully responded to the testimony of Dr. Gofman, and the case was probably ready for argument. This was naive, as the Court had not yet heard the testimony of Rowland, Taylor and Fabrikant.

The plaintiffs in this case allege that they contracted cancer and leukemia as a result of radium, radon gas, and radon progeny exposure. It is more appropriate, therefore, to consider the studies of the radium dial painters who were exposed to these same substances and who have been studied for more than 50 years. (T.Tr. Vol. 58, pp. 4576–4581). In 1969, all of the radium dial painter studies were centralized at Argonne National Laboratory under the supervision of Dr. Robert Rowland. (T.Tr. Vol. 48, p. 4562).

. Dr. Rowland's primary research interest since 1950 has been the study of radium ingestion and inhalation in the human body. (T.Tr. Vol. 58, p. 4588). He helped develop the first whole body counter at Argonne National Laboratory and exhumed the first human body for radium content analysis. (T.Tr. Vol. 58, pp. 4560 and 4590). The efforts of Dr. Rowland and his associates at Argonne to obtain all available data regarding the radium dial painters is impressive. (T.Tr. Vol. 58, p. 4562 *et seq.*). Their studies of the incidence of disease among the dial painters has been confirmed by independent researchers. (T.Tr. Vol. 58, p. 4641).

Dr. Rowland was a member of the National Council on Radiation Protection and Measurements for 12 years and resigned upon his retirement a year ago. As noted above, this council consists of the nation's outstanding experts in the area of radiation biology. Dr. Rowland was selected for council membership because of his exper-

tise in radium ingestion. (T.Tr. Vol. 58, p. 4601).

In the Court's view, Dr. Rowland is a highly credible and most refreshing witness. His comparative studies regarding the radium dial painters are highly relevant and persuasive in these cases. His description of radium sulphate as analogous to calcium is most convincing. His additional relevations of misleading practice at the hands of Dr. Morgan came to light. By example, Dr. Morgan took a whole body burden found in the Geiger Studies of the "C" Plant, i.e., factor B, and applied it to the colon of Mrs. Mewhinney. (T.Tr. Vol. 58, p. 4615). Now, no body burdens were found at the AID Plant. Simply said, the radium content found by Dr. Morgan is exorbitant and unbelievable. (T.Tr. Vol. 58, p. 4627).

Dr. William Moloney is a professor emeritus at Harvard Medical School and he is a practicing hematologist. He served as a hematologist with the Atomic Bomb Casualty Commission in Japan and served on the BEIR Committee. Presently he is a consulting hematologist for the World Health Organization study on irradiated women. Not only is he a medical doctor who still treats patients, but he has served on eminent committees that have specifically studied the carcinogenic effects of radiation.

Dr. Neil Wald is experienced in many aspects of radiation health. He has served both as a physician involved in the clinical aspects of treatment and as a medical researcher with an emphasis upon cytogenetics, hematology, and cancers of the blood-forming organs. He served on the Atomic Bomb Casualty Commission, and has a long career in radiation protection. He is presently a professor of radiation health at the University of Pittsburgh Graduate School of Public Health, and a professor of radiology at the University of Pittsburgh School of Medicine. He is eminently qualified to give medical opinions in this case.

Dr. Vincent Collins has M.D. and J.D. degrees. His medical specialty is radiology, like Dr. Saenger, and he has been treat-

ing patients with radiation since 1945. He also teaches medical students. One issue in this case has been how long a cancer has been growing before it is diagnosed by a doctor. This is the question known as tumor "doubling times." Dr. Collins has written the seminal article on this topic and he was the first person to use the term "doubling time" to describe the growth of cancer. He was also the first person to use the term "period of silent growth." On the question of how long a certain cancer existed before it was diagnosed, there could be no better witness than Dr. Collins, and his testimony on latency is accepted.

Perhaps the most eminent person to testify at trial was Dr. Lauriston Taylor. He has been involved in the development of national and international radiation protection standards since approximately 1927. Indeed, he is a founding member of two of the most important groups of radiation protection scientists, the ICRP and the NCRP. Moreover, NBS Handbooks H–18, H–23 and H–27 were prepared under his supervision, so he is eminently qualified to testify as to their applicability to the facts of these cases. This Court finds that Dr. Taylor's vast experience with radiation protection enables him to explain just how "hazardous" a certain dose really is.

Since one of the precise issues before this Court was the carcinogenic effect of occupational doses of ionizing radiation, this Court cannot conceive of a better expert witness than Dr. Jacob Fabrikant. Not only is he a medical doctor who has been trained as a surgeon, practices as a radiologist, treats patients and conducts cancer research, but he also has served on the National Academy of Sciences BEIR I, BEIR II, and BEIR III Committees. His testimony on whether or not occupational doses at AID caused these four cancers is entitled to very great weight and is adopted in its entirety.

### VIII. *Credible Dose Theories*

*Geiger and Schmidt Dose Opinion.* When researchers Geiger and Schmidt actually made measurements in 15 typical plants in Wichita, including AID, they concluded that it was unlikely a worker in any plant would get more than 500 mrem per year. (Ex. 9507, p. 11). They also concluded that although there was considerable measurable surface alpha contamination, it did not result in an internal dose, except in the case of two employees who had been dial painters at ACD. Geiger and Schmidt's 1969 opinion is not totally binding upon this Court; however, it does provide an objective yardstick of reasonableness. If, through the years relevant in these cases, AID was operated in a manner typical of the way other instrument repair plants in Wichita were operated, then this Court would expect to see small external doses and no measurable internal doses. Unless the plaintiffs' evidence proves that AID was atypical, there is no good reason to believe that these four plaintiffs received large doses of radiation. Since two of these plaintiffs, Womack and Mewhinney, worked for approximately 14 years each, we should expect to see doses of 14 years times something less than 500 mrem, for a total of less than 7,000 mrem or less than 7 rem for those two women. Since Don Vessels and Earl Johnston worked for approximately two years, we should expect to see doses of two years times something less than 500 mrem, for a total of less than 1,000 mrem or less than 1 rem for these two men. Doses in this range constitute reasonably believable doses.

*Dr. Auxier's Dose Opinion.* Dr. Auxier used the Geiger and Schmidt opinion as one basis for his opinion. The second assumption he made was that AID was indeed typical of the other Wichita plants all during the time plaintiffs worked there. The third assumption he made was that these plaintiffs were typical average workers who received an average exposure rather than the highest estimate that Geiger and Schmidt made. (T.Tr. Vol. 39, pp. 3113–3141). Consequently, Dr. Auxier assumed that an average exposure would be 100 to 500 mrem per year. Moreover, he knew that 500 mrem per year was the international safety standard for individual members of the general public and was not

considered a harmful dose. (T.Tr. Vol. 39, p. 3113). In fact, 10 times that level is not considered unduly hazardous for radiation workers. (T.Tr. Vol. 39, p. 3114). At less than 500 mrem per year, a person who worked there 14 years would have a total approximate dose of less than 7 rem, and a person who worked there for two years would have a total dose of less than 1 rem. These doses are not health hazards. (T.Tr. Vol. 40, pp. 3145–3146).

In addition to the measured data in the Geiger and Schmidt Study, Dr. Auxier's dose calculations are consistent with the measurement of the whole body counts by Helgerson, which show no internal dose in AID employees. (Ex. 12,148). His conclusions are consistent with the hard data of whole body counts of these four plaintiffs, which show a zero internal dose of radium-226. (Ex. 12,406 & 12,407). His dose estimates are consistent with the film badges of AID employees. (Ex. 10,532). Dr. Auxier's doses are consistent with the "secret" film badges worn by Mrs. Womack and Mrs. Mewhinney. (Ex. 12,389). While the analysis of Drs. Morgan and Gofman are totally inconsistent with this measured data, Dr. Auxier's analysis is consistent with them. (T.Tr. Vol. 41, pp. 3282–3284).

Dr. Auxier's doses are as follows:

| | |
|---|---|
| Barbara Womack | < 7 rem |
| Lila Mewhinney | < 7 rem |
| Don Vessels | < 1 rem |
| Earl Johnston | <1 rem |

This Court finds that this approach is sound, that his analysis and conclusions are based upon actual measurements, and that his conclusions meet the test of reasonableness.

*Dr. Maletskos' Dose Opinion.* Dr. Maletskos constructed a model which he then modified for the specific facts of each plaintiff's case in order to calculate very precise doses. (T.Tr. Vol. 48, pp. 3854–3877). Dr. Maletskos has been associated with the radium dial painters study for 36 years. (T.Tr. Vol. 47, p. 3719). He has carefully studied all the literature on the subject of radium in man over all those years. (T.Tr.

Vol. 47, p. 3719). He has personally measured and calculated doses for persons exposed to radium thousands of times, including the radium dial painters. (T.Tr. Vol. 47, p. 3721). This Court finds him eminently qualified to make dose estimates based upon such modeling. While his model cannot reproduce exactly the conditions under which these particular plaintiffs worked, it does constitute a reasonable representation, especially since it is fine-tuned according to the plaintiffs' own testimony of how they worked. T.Tr. Vol. 48, pp. 3877–3878).

The precise doses Dr. Maletskos calculated to the exact organ where each plaintiff's cancer grew were:

| | |
|---|---|
| Barbara Womack | 3.2 rem |
| Lila Mewhinney | .16 rem |
| Don Vessels | .49 rem |
| Earl Johnston | .06 rem |

(Ex. 12,409, p. 46).

The Court finds that these doses are credible, that they are consistent with the doses to be expected from Geiger and Schmidt's predictions, and that they are consistent with the doses calculated by Dr. Auxier. Since both Dr. Auxier's and researchers Geiger and Schmidt's doses are general, whereas Dr. Maletskos' doses are specifically calculated according to plaintiffs' actual testimony and calculated for the exact organ where each plaintiff developed cancer, this Court will adopt Dr. Maletskos' doses. Therefore, this Court finds that, as a finding of fact, these plaintiffs received the following doses at AID: to Barbara Womack's thyroid, 3.2 rem; to Lila Mewhinney's colon, .16 rem; to Don Vessels' bone marrow, .49 rem; and to Earl Johnston's lungs, .06 rem.

*Internal Alpha Dose.* If these plaintiffs had received any significant internal dose from alpha particles from inhaled or ingested radium, a substantial portion of the inhaled or ingested radium would have been deposited in their bones and would be there today. Whole body counts have been done on all four plaintiffs and they conclusively prove that these four people have no more radium in their bodies than a normal aver-

age human being. (Ex. 12,406 & 12,407). This is conclusive scientific proof that these plaintiffs can be credited with a zero or insignificant internal dose from alpha particles, and this Court so finds. (T.Tr.Vol. 59, pp. 4559, 4585, 4588, 4589, 4598, 4603, 4606, 4613–4614, 4619 & 4697).

*Doses Not Hazardous.* Now that this Court has found as fact the probable doses these four plaintiffs received at AID, this Court can answer the question of whether or not such doses are hazardous. Throughout this trial, plaintiffs have attempted to portray radium-226 as an ultrahazardous material. Perhaps they are correct for large amounts of radium-226 that constitute large doses. However, as mentioned earlier, this Court is not concerned with single items which are 10,000° F "hot" to 300,000° F "hot", but rather is concerned with single items which are only 4° F "hot".

Another way of seeing the proper perspective is to realize that the amounts of radium-226 at AID created doses ranging from .06 rem to 3.2 rem in these four plaintiffs. · BEIR III · tells us the soil of Kansas gives off a dose of 46 mrem per year or .046 rem per year. (BEIR III, p. 38, figure III–I). During the same two years that Earl Johnston received his .06 rem from AID, he received .046 × 2 = .092 rem from Kansas soil. In other words, during his two years of employment at AID, Earl Johnston received more radiation from Kansas dirt than he received from radium in AID. During the same 14 years that Barbara Womack received her 3.2 rem from AID, she received .046 × 14 = .644 rem from Kansas soil. If Barbara Womack lives in Kansas for 70 years, she will have received .046 × 70 = 3.22 rem from Kansas dirt. If she moves to Denver, Colorado, where soil gives off .09 rem per year, she will accumulate her 3.2 rem dose in about 35 years. (BEIR III, p. 38, figure III–1). These two examples only compare the plaintiffs' doses with the doses that all Kansas residents get from soil.

Another way to understand the meaning of these ·doses is to compare them with total background radiation for the average American. BEIR III tells us that the average American will get a dose of approximately 80 mrem per year or .08 rem per year to his GI tract. (BEIR III, p. 44, table III–4). Since Lila Mewhinney received a dose of .16 rem to her colon during her 14 years of employment at AID that is the same dose her colon receives every two years from natural background radiation. In 14 years, her colon would receive 1.12 rem from background radiation, seven times more than she received during those same years at AID. During his two years at AID, Don Vessels received a dose of .49 rem to his lungs. BEIR III tells us that every year the average American receives a dose of 180 mrem to 530 mrem, or .18 rem to .53 rem, to his lungs. (BEIR III, p. 44, table III–4). In other words, Vessels' dose to his lungs at AID is equal to what he gets about every one or two years from natural background radiation.

Suddenly we see that if this Court were to accept plaintiffs' characterization and hold that radium at AID is ultrahazardous just because it makes Geiger counters click, this Court would be forced to rule that Kansas soil is also ultrahazardous. At a bare minimum, ultrahazardous must mean that something is abnormally dangerous. Since the normal background radiation all people experience cannot be abnormally dangerous, the levels of radiation at AID cannot be considered to be ultrahazardous.

Another way to understand what these doses mean is to compare them with internationally accepted safety standards for radiation workers. The highest dose of these four plaintiffs is Barbara Womack's 3.2 rem. She received this over a 14-year period. The eminent world experts on radiation have· set the dose a radiation worker can receive in any single year at 5 rem, more than Mrs. Womack received in 14 years of employment. According to international scientific consensus, 5 rem per year is a permissible dose, which is "the dose of ionizing radiation that, in the light of present knowledge, is not expected to cause appreciable bodily injury to people at

any time during his lifetime." (National Bureau of Standards Handbook 59, p. 27; T.Tr.Vol. 63, pp. 4951–4953). For this Court to find that a dose of 3.2 rem received over 14 years was an ultrahazardous dose, it would have to reject the international consensus of radiation protection scientists.

Yet, another way to understand the meaning of a dose of 3.2 rem is to realize that someone living in Florida will receive about 23 mrem per year from the soil. If that person then moves to Denver, Colorado, he will receive 90 mrem per year from the soil. A simple move from Florida to Denver creates an additional yearly dose of 67 mrem from soil alone. In 50 years, this person who made the move would acquire a dose of .067 rem × 50 = 3.35 rem from the soil alone. Consequently, Mrs. Womack's dose at AID is like the increased dose from normal soil to someone living 50 years in Denver, as compared to someone living 50 years in Florida. The Court cannot find that such a dose is ultrahazardous. In fact, people who move from Florida to Denver are never warned about the increased radiation, they never even consider it a simple hazard, and the existing evidence shows that there is less cancer in Denver than there is in Florida. (T.Tr.Vol. 56, pp. 4393–4394). This Court finds that there is absolutely no scientific reason to consider the doses these workers received at AID ultrahazardous. (T.Tr.Vol. 63, pp. 5055–5059). Dr. Gofman's insistence that this work at AID was ultrahazardous is just not scientifically correct.

*Doses do not "Proximately Cause" Cancer.* Scientists have observed more cancers than would normally be expected in certain populations exposed to high levels of radiation. For example, the radium dial painters did experience increased bone cancers and cancers of the paranasal sinuses and mastoid air cells. (BEIR III, pp. 411–422). However, "only one bone sarcoma case (at 888 rads at diagnosis) is known to have occurred below 1,000 rads." (BEIR III, p. 415). One thousand rads of alpha radiation is equal to 20,000 rem. (T.Tr.Vol. 40, p. 3164; Vol. 41, p. 3237). Another

example is the British ankylosing spondylitic patients who were treated with large doses of x-rays in the 1930's and 1950's. (BEIR III, p. 160). These people received doses of about 500 to 1,500 rem to the spinal bone marrow (BEIR III, p. 163, figure V–1); doses of about 306 to 918 rem to the esophagus (BEIR III, p. 169, table V–7); and doses of about 698 to 2,094 rem to the spinal cord and nerves (BEIR III, p. 164, table V–7).

The radiation protection community scientists who have gathered this data for more than half a century have concluded that scientifically observable excess numbers of cancer have appeared in populations exposed to high doses of radiation. These high doses are generally above approximately 100 rem. (T.Tr.Vol. 40, p. 3158). Since the highest dose that any of these four plaintiffs received is only 3.2 rem, we have no reliable data that gives us excess cancers for such a low level of exposure. (T.Tr.Vol. 40, pp. 3158–3159). The way radiation scientists estimate the risks at low doses is to use various hypotheses such as the linear hypothesis or the quadratic hypothesis or the linear-quadratic hypothesis. (T.Tr.Vol. 40, p. 3159). This Court finds that when radiation scientists speak about a mathematical risk from a 3.2 rem dose of radiation, they are speaking about "theoretical, hypothetical numbers." (T.Tr.Vol. 63, p. 4947). These types of numbers are not real numbers because if that risk exists at all it is "not something you can determine in a quantitative fashion in real life." (T.Tr.Vol. 63, p. 4947). When referring to occupational doses, Dr. Taylor explained that, "We can't make any measurements down in that region; we can't find effects down in that region." (T.Tr. Vol. 63, p. 4947).

This problem, and the method by which radiation safety standards are set, was explained by National Bureau of Standards Handbook 59, written in 1948. At that time, the safety standard in the United States was 36 rem/yr, and in Europe it was 72 rem/yr. The report was published in 1954 after both the NCRP and the ICRP

had adopted a new standard of 15 rem per year. Dr. Taylor was chairman of the committee that wrote the following:

As a matter of principle, it is sound to avoid all unnecessary exposure to ionizing radiation because it is desirable not to depart from the natural conditions under which man has developed by evolutionary processes. However, man has always lived in a field of ionizing radiation due to the presence of radioactive materials in the earth and to cosmic rays. Whether exposure to this level of radiation is beneficial or deleterious to man and the race, is a matter of speculation. The obvious fact is that it cannot be avoided and it is therefore normal for man to live in this environment. We have then a lower limit of continuous exposure to radiation that is (unavoidably) tolerated by man. There is on the other hand a much higher level of exposure that is definitely known to be harmful. Between these two extremes, there's a level of exposure in the neighborhood of 0.1 R per day, that experience to date shows to be safe for the individual concerned. However, the time of observation of large numbers of people exposed at this rate under controlled conditions is too short to permit a categorical assertion to this effect. It should be noted in this connection that lowering the level of exposure by a factor of two or even ten does not materially alter the situation insofar as making a positive statement of absolute safety is concerned. The only statement that can be made at the present time about the lifetime exposure of persons to penetrating radiation at a permissible level considerably higher than background radiation level but within the range of radiological experience is that appreciable injury manifestable in the lifetime of the individual is extremely unlikely. It is, therefore, necessary to assume that any practical limit of exposure that may be set up today would involve some risk of possible harm. The problem then is to make this risk so small that it is readily acceptable to the average individual; that is, to make the risk essentially the same as is present in ordinary occupations not involving exposure to radiation.

Even on this more liberal basis, the solution of the problem is still difficult. Lack of extensive long-term practical experience under controlled conditions precludes a prior accurate determination of risk for any exposure level that may be adopted. The only thing that can be done at present is to adopt a value that in the light of all available information can be confidently expected to conform with the criterion of acceptable risk. (NBS Handbook 59, p. 20).

The concept of a permissible dose involves the assumption that if a dose is lower than a certain value, the threshold value, no injury results. Since it is what seems well established that there is no threshold dose for the production of gene mutations by radiation, it follows strictly speaking, there is no such thing as a tolerance dose when all positive effects of radiation on the individual and future generations are included. In connection with the protection problem, the expression has been used in a more liberal sense; namely, to represent a dose that may be expected to produce only "tolerable" deleterious effects, if any are produced at all. Since it is desirable to avoid this ambiguity, the expression permissible dose is much to be preferred.

It is now necessary to give this expression a more precise meaning. In the first place, it is well to state explicitly that the concept of a permissible dose envisages the possibility of radiation injury manifestable during the lifetime of the exposed individual or in subsequent generations. However, the probability of occurrence of such injuries must be so low that risk would be readily acceptable to the average individual. Permissible dose may then be defined as the dose of ionizing radiation that, in the light of present knowledge, is not expected to cause appreciable bodily injury to people at any time during his lifetime. As used here, "appreciable bodily injury" means

any bodily injury or effect that the average person would regard as being objectionable and/or competent medical authorities would regard as being deleterious to the health and well being of the individual. "Dose" is used here in this radiological sense and particularly as tissue dose in the irradiated tissue, organ or region of interest. What constitutes the region of interest depends on the conditions of exposure and must be taken into account in assigning numerical values to the permissible dose or doses applicable to a given set of conditions. (NBS Handbook 59, pp. 26–27).

This Court finds that sincere and eminent scientists, like Dr. Taylor, who have constituted the radiation protection community for over half a century, have carefully studied all the known literature on the carcinogenic potential of radiation and have set safety standards that were not expected to cause bodily injury during the lifetime of the exposed individual. These standards have ranged from 72 rem per year down to 5 rem per year, but the reductions have not been made because there was any evidence of harm at the higher levels. The reductions were made because hospitals and industry could and were operating at these much lower doses already so there was no good reason to have a standard set way above common practice. (T.Tr.Vol. 63, pp. 4974–4980, 5032, 5039–5041, 5044–5045).

We can see that in matters of determining the cancer risk from low occupational doses of radiation, scientists do not deal with what exists in fact and can be measured or experimentally proven. Rather, they deal with theory, hypothesis and assumption. While such an approach is a valid way to set general safety standards, it cannot be used to establish legal cause through mathematical calculations. A theory of hypothesis or assumption which yields a number like 97.6% or 8% is not yielding a real number. Cause in tort law needs to be founded on more than a theory or hypothesis. Professor Prosser instructs us:

[H]as the conduct of the defendant caused the plaintiffs harm? This is a question of fact.... Causation is a fact. It is a matter of what has in fact occurred.

Law of Torts, 4th Ed., page 237.

On the issue of the fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

Law of Torts, 4th Ed., page 241.

As previously explained, the statistical methodologies of Drs. Morgan and Gofman do not measure up to Prosser's test of proof of causation. These opinions are not based upon actual numbers of what, in fact, has occurred. Rather, they are based upon hypothetical assumptions of what the risks might be. Moreover, the doses used by Dr. Morgan and Dr. Gofman in their mathematical formula bear no real relationship to the actual facts of this case. Furthermore, neither Dr. Morgan nor Dr. Gofman uses the risk coefficients which are internationally accepted by eminent radiation scientists. Consequently, their testimony is so flawed that no knowledgeable court should accept such an approach as proof of causation in a tort lawsuit. (T.Tr. Vol. 56, pp. 4374–4378).

Yet this Court's concern goes further. Dr. Fabrikant used the correct doses and he used the internationally accepted risk coefficients to calculate a probability of causation for these four plaintiffs ranging from 0.01% to 3%. Does Dr. Fabrikant's probability of causation calculation prove that there is a 0.01% to 3% risk just because he uses the right doses and the right risk coefficient? The answer must be no.

What Dr. Fabrikant has calculated for this Court is based on the radiation scientists' best theory or hypothesis of what the upper limit of real risk may be. The real risk could be anywhere from zero to 3%. Even the scientists' best guess is statistical speculation, not proof "of what in fact occurred." Prosser, Law of Torts 4th Ed., page 237. "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture ... it becomes the duty of the court to direct a verdict for the defendant." Prosser, Law of Torts 4th Ed., page 241.

Thus, when the doses are so low that the existence of any effect at all is only hypothetical theory, such calculations are mere speculation. In the Court's view, these calculations should not, nor will they, be accepted here as valid evidence on causation. See O'Connor v. Industrial Commission, 19 Ariz.App. 43, 504 P.2d 966 (1973); Garner v. Hecla Mining Corporation, 19 Utah 2d 367, 431 P.2d 794 (1967).

As indicated, this Court finds that plaintiffs have produced no credible evidence upon which a court of law would find that doses of .06 rem to 3.2 rem cause cancer.

### IX. Latency Periods Indicate No Causation

Certainly it is true that radiation causes a cancer such as leukemia. (BEIR III, p. 2). However, when scientists observe a statistical increase in certain cancers in a population exposed to radiation, they only see this statistical increase years after the exposure. BEIR III defines a latent period as a "period of seeming inactivity between time of exposure of tissue to an injurious agent and response." (BEIR III, p. 519). On the facts of each plaintiff's case this Court needs to ask how the latency period for radiation induction of this particular cancer fits the facts of that case.

Don Vessels' lung cancer was diagnosed 10 months after he started employment at AID. Consequently, even if the very first gamma ray he received at AID theoretically caused his cancer, the latency period for radiation-induced lung cancer would have to be 10 months or less. If the minimum latency period is more than 10 months, then AID-generated radiation can be ruled out as the cause of his cancer by that fact alone. BEIR III tells us that the minimum latency period for radiation-induced lung cancer is 10 years, not 10 months. (BEIR III, pp. 326–327). Consequently, if radiation just happened to cause Mr. Vessels' lung cancer, it would have to have been some radiation he received about nine years before he ever started employment at AID.

Earl Johnston's leukemia was diagnosed one year and 11 months after he started employment at AID. BEIR III tells us that the minimal latency period for leukemia is two to three years. (BEIR III, p. 353). Furthermore, BEIR III is more specific with respect to someone of Mr. Johnston's age at exposure and type of leukemia. For someone exposed after age 30 and developing chronic granulocytic leukemia, like Mr. Johnston, the more precise minimum latency period is at least six years. (BEIR III, p. 339, figure A–4). Consequently, if radiation just happened to have been the cause of Mr. Johnston's leukemia, it would have to be radiation he received approximately four years before he started working at AID.

Lila Mewhinney's rectal cancer was diagnosed five years and nine months after she started working at AID. BEIR III tells us that there is no evidence that low doses of radiation cause rectal cancer, so there can be no latency period, but high doses have a minimum latency period of nine years. (BEIR III, p. 369). Consequently, even if radiation happened to have caused her rectal cancer, it must have been some radiation she received about three years before she started working at AID.

Barbara Womack's enlarged thyroid was removed 13 years and eight months after she first started working at AID. BEIR III tells us that a minimum latency period of 10 years seems to be reasonable. (BEIR III, p. 304). Consequently, of the four plaintiffs, Barbara Womack is the only one whose case is not ruled out on latency periods alone. However, the 10-year mini-

mum latency period would indicate that only radiation which she received prior to September 23, 1970 (10 years before her thyroidectomy) could have been even a possible cause of the tumor. Dr. Maletskos calculated a dose of 3.2 rem for all of her employment at AID. He did not deduct all the "wasted" radiation she would have received after September 23, 1970. If this Court assumes that the 3.2 rem were spread equally over all of her 12 years and four months of employment, then her monthly dose would be 3.2 rem divided by 148 months = 0.0216 rem per month. Since she worked at AID for 44 months prior to September 23, 1970, her "effective" dose would be approximately 0.0216 rem × 44 months = .95 rem. In examining this question of whether radiation at AID caused Mrs. Womack's thyroid tumor, the latency period requires this Court to cut the calculated dose down from 3.2 rem to 0.95 rem. Furthermore, BEIR III tells us that the average latency period appears to be 20 years. (BEIR III, p. 304). Consequently, while the latency period for radiation-induced thyroid tumors does not rule out Barbara Womack's case, it serves to cut the doses by two-thirds and further reduce the likelihood of causation since her tumor occurred prior to the average latency period.

## X. *Period of Silent Growth Indicates No Causation*

The duration of a cancer can be divided into two periods, the period of silent growth during which the cancer goes undetected, and thereafter the period of clinical observation. Often the period of silent growth takes up to 75% of the life of the cancer. (T.Tr.Vol. 63, pp. 5092–5096; Vol. 64, p. 5146).

The doubling process of the cancer cells continues at the same rate. But because of its exponential growth, the tumor does not become large enough to be observed until it has doubled approximately 30 times. Also, because of the exponential growth, once the tumor has doubled 42 times it becomes so large that its effect becomes fatal. (T.Tr.Vol. 63, pp. 5104–5105).

The most common lung cancer is squamous cell carcinoma, which is one of the more slow-growing cancers. Its doubling time varies from 30 days or less to 90 days or more. (T.Tr. Vol. 63, p. 5105).

The parties have stipulated that Don Vessels' tumor was two centimeters in size when it was first detected in August 1979. Dr. Collins testified that a tumor the size of one centimeter would contain a billion cells. Assuming the average doubling time for squamous cell carcinoma, if Don Vessels' tumor was but one centimeter in size, it would have been growing for five years before it was detected. Even if Don Vessels' tumor was but one centimeter in size, and the tumor was doubling at the rate of once every 30 days, it would still have been in existence when he started work at AID. Consequently, the period of silent growth rules out causation in Mr. Vessels' case.

Cancer of the colon and rectum is one of the slow-growing cancers. (T.Tr.Vol. 64, p. 5129). Lila Mewhinney's tumor was described as being three centimeters in size at the time it was removed. To develop to this size the tumor would have had to double some 34 times. Using a doubling time of 90 days (as recommended by Dr. Collins), Lila Mewhinney's cancer would have begun to develop eight and a half years earlier, which would predate her tenure at AID. (T.Tr. Vol. 64, p. 5127). Consequently, radiation at AID did not cause the start of her cancer.

Although Barbara Womack had been employed at AID during a 13-year period prior to being diagnosed as having thyroid cancer, the majority of thyroid cancers observed to have been caused by radiation occurred after a period of 20 years. In Mrs. Womack's case, it was the opinion of Dr. Collins that the nodule identified in 1980 as a carcinoma would be part of the nodular goiter observed in 1963, four years before going to work for AID. (T.Tr.Vol. 64, p. 5132–5133). On the basis of these facts, it is unlikely that Ms. Womack's cancer was caused by radiation at AID.

Earl Johnston's leukemia was diagnosed in July 1979—23 months after he began

work at AID. Although this is a shorter period than the generally accepted minimum latency period of two years, it is evident that Earl Johnston's leukemia could have been diagnosed months earlier. In retrospect, his elevated white blood count, his complaints of feeling tired in November 1978, and his enlarged spleen in January 1979, are all indicative of his leukemia. It is more likely than not from this evidence alone that the silent growth of Earl Johnston's leukemia began before his employment at AID. (T.Tr.Vol. 64, p. 5135).

## XI. *Medical Opinions Indicate There is No Causation*

The opinions of Dr. Morgan and Dr. Gofman cannot be considered at this time because they do not constitute valid medical opinions. In addition, they are statistical opinions which this Court has already rejected. Likewise, the opinions of Dr. Johnson, Dr. Moore, and Dr. Padgett cannot be considered because this Court has already rejected them. This leaves the Court with the medical opinions of Dr. Saenger, Dr. Wald, Dr. Moloney, Dr. Collins, and Dr. Fabrikant.

All of these men are medical doctors who have had extensive experience as members of the radiation protection community. Not one of them testified that in his medical opinion any of these plaintiffs' cancers were caused by radiation exposure at AID. All testified that their opinions to a reasonable degree of medical certainty were that the plaintiff who fell into their medical specialty did not suffer from a radiation-induced cancer.

Mr. Vessels' lung cancer was not caused by radiation at AID for reasons which include the following: the doses were much too low (Dr. Maletskos, Dr. Moloney, Dr. Saenger; Ex. 12,408; T.Tr. Vol. 59, pp. 4760–4761; Vol. 57, pp. 4462–4475); radium-226 contamination causes bone cancer, not lung cancer, and there was no increase in lung cancers among radium dial workers (Dr. Rowland; T.Tr. Vol. 58, pp. 4649–4654; Vol. 64, pp. 5244–5246); the tumor started before employment at AID and was undergoing a period of silent growth during Mr. Vessels' employment at AID (Dr. Collins, Dr. Moloney; T.Tr. Vol. 64, pp. 5120–5137); the minimum latency periods for radiation-induced lung cancers are at least 10 years, not less than 10 months (BEIR III, pp. 319, 323, 326, & 327; Dr. Fabrikant; T.Tr. Vol. 64, pp. 5236–5237); "when one considers how much he smoked, the duration of smoking, the age at which he began smoking, and the total 50-pack-years-of-use, and the histological diagnosis of squamous cell lung cancer, the medical evidence available indicates that cigarette smoking was, to the largest extent possible, the dominant risk factor that contributed to the development of Mr. Vessels' lung cancer" (Dr. Fabrikant's Report, p. 41); the correct statistical probability that AID radiation caused Mr. Vessels' lung cancer is approximately 0.01% if we assume that all the "wasted" radiation could have been effective (Dr. Fabrikant's Report, p. 45; T.Tr. Vol. 64, p. 5224); to a reasonable degree of medical certainty, radiation was not the cause of Mr. Vessels' lung cancer (Dr. Fabrikant's Report, p. 47; T.Tr. Vol. 64, p. 5238). Drs. Moloney and Saenger agreed.

Mrs. Womack's thyroid nodule was not caused by radiation at AID for reasons which include the following: the doses were much too low (Dr. Maletskos, Dr. Saenger, Dr. Moloney; Ex. 12,409; T.Tr. Vol. 59, p. 4767; Vol. 57, pp. 4415–4430); radium-226 contamination causes bone cancer, not thyroid nodules, and there was no increase in thyroid cancer among radium dial painters studied (Dr. Rowland; T.Tr. Vol. 58, pp. 4648–4649; Vol. 64, pp. 5244–5246); the tumor would have undergone a long period of silent growth so most of the radiation she received at AID would have been "wasted" radiation (Dr. Collins; T.Tr. Vol. 64, pp. 5130–5134); the median latency period for radiation-induced thyroid tumors is 15 to 20 years after irradiation (BEIR III, p. 302); Barbara Womack's tumor appeared within 13 years after her first employment at AID, thus radiation at AID could not be considered to be the cause of her disease (Dr. Fabrikant; T.Tr. Vol. 64, pp. 5231–5235); the scientific consensus re-

ported in BEIR III tells us that her size of thyroid nodule "should not be considered cancer ... (and) there is minimal or no evidence that this lesion is induced by radiation" (BEIR III, p. 292); BEIR III tells us that a "minimum latency period of 10 years appears reasonable" and Mrs. Womack's thyroid was enlarged in 1974, seven years after her initial employment at AID (BEIR III, p. 304; T.Tr. Vol. 64, pp. 5232–5233); the correct statistical probability that AID radiation caused Barbara Womack's thyroid nodule is approximately 3% if we assume that the "wasted" radiation could have been effective (Dr. Fabrikant; T.Tr. Vol. 64, p. 5224); to a reasonable degree of medical certainty, radiation at AID was not the cause of Barbara Womack's thyroid cancer (Dr. Fabrikant, Dr. Saenger, Dr. Moloney; T.Tr. Vol. 64, p. 5234).

Earl Johnston's leukemia was not caused by radiation at AID for reasons which include the following: his dose was much too low (Dr. Maleskos, Dr. Saenger, Dr. Moloney, Dr. Wald; Ex. 12,409; T.Tr. Vol. 57, p. 4475; Vol. 59, p. 4755); radium-226 contamination causes bone cancer, not leukemia, and excess leukemia did not appear in the radium dial painters study (Dr. Rowland; T.Tr. Vol. 58, pp. 4639–4643; Vol. 64, pp. 5244–5246); the leukemia must have started before Earl Johnston even started employment at AID (Dr. Collins, Dr. Moloney, Dr. Wald; T.Tr. Vol. 64, pp. 5134–5137); the minimum latency period for radiation-induced leukemia is two years (BEIR III, pp. 2, 353; Dr. Fabrikant, Dr. Saenger, Dr. Moloney, Dr. Wald; T.Tr. Vol. 59, p. 4730); the minimum latency period for the type of leukemia Earl Johnston had and for a person of his age is about six years (BEIR III, p. 339, figure A–4; Dr. Fabrikant; T.Tr. Vol. 64, pp. 5239–5240); the average latency period for a person of Earl Johnston's age and with his type of leukemia is about nine years (BEIR III, p. 339, figure A–4; Dr. Fabrikant; T.Tr. Vol. 64, pp. 5239–5240); Mr. Johnston's leukemia started from eight to 13 years before he started working at AID (Dr. Fabrikant's Report, p. 23); the correct statistical probability that AID radiation caused Mr. Johnston's leuke-

mia is approximately 1% if we assume all the "wasted" radiation could have caused the disease and if we ignore latency periods (Dr. Fabrikant; T.Tr. Vol. 64, p. 5224); to a reasonable degree of medical certainty, radiation was not the cause of Mr. Johnston's leukemia (Dr. Wald, Dr. Maloney, Dr. Fabrikant; T.Tr. Vol. 64, pp. 5241–5242; Vol. 60, pp. 4823–4825; Vol. 57, p. 4481).

Mrs. Mewhinney's rectal cancer was not caused by radiation at AID for reasons which include the following: the doses were much too low (Dr. Maletskos, Dr. Saenger, Dr. Moloney; Ex. 12,408; T.Tr. Vol. 59, pp. 4765–4766); radium-226 contamination causes bone cancer and not rectal cancer (Dr. Rowland; T.Tr. Vol. 58, pp. 4643–4648; Vol. 64, pp. 5244–5246); the tumor would have undergone a long period of silent growth, so most of the radiation she received at AID would have been "wasted" radiation (Dr. Collins; T.Tr. Vol. 64, pp. 5130–5134); the Japanese atomic bomb survivor mortality experience based on death certificate information has so far failed to provide unequivocal evidence of a relationship between radiation dose and intestinal or rectal cancer (BEIR III, p. 367); if there is a relationship, it is "relatively minor in terms of overall excess cancer risk" (BEIR III, p. 370); Lila Mewhinney's rectal cancer was more likely caused by her diet (T.Tr. Vol. 50, p. 4743; Vol. 56, pp. 4432–4433); the minimum latency period for radiation-induced colo-rectal cancer is approximately 10 years while Lila Mewhinney's cancer was diagnosed approximately five and a half years after she started employment at AID (Dr. Fabrikant's Report, pp. 31–32; T.Tr. Vol. 64, p. 5242); the average latency period for colo-rectal cancer is 15 to 25 years compared to Lila Mewhinney's five and a half years (Dr. Fabrikant's Report, p. 32; T.Tr. Vol. 64, p. 5242); if radiation induced her tumor, then Lila Mewhinney's cancer most probably started from three to 18 years before she started employment at AID (Dr. Fabrikant's Report, p. 32; T.Tr. Vol. 64, pp. 5242–5244); even if all the "wasted" radiation is counted, the correct statistical prob-

ability that AID radiation caused Lila Mewhinney's rectal cancer is approximately 1% (Dr. Fabrikant; T.Tr.Vol. 64, p. 5224); to a reasonable degree of medical certainty, radiation at AID did not cause Lila Mewhinney's rectal cancer (Dr. Fabrikant, Dr. Saenger, Dr. Moloney; T.Tr. Vol. 64, p. 5244).

## XII. *Radiation at AID did not Cause Plaintiffs' Cancers*

For all the reasons explained previously, this Court now holds that the cancers of Don Vessels, Earl Johnston, Lila Mewhinney, and Barbara Womack were not caused by any radiation they received while employed by AID. Consequently, and for these reasons, the plaintiffs' case should also fall.

Notwithstanding, this case, so fully litigated, deserves decision on the following issues.

## XIII. *Duty to Label Instruments*

The plaintiffs have insisted from the outset that the United States and any supplier of radioactive aircraft instruments have a duty to warn of this propensity, and, of course, the process is sufficed in part by the labeling of each. Again, from the outset, the Court, accepting the plaintiffs' thesis that exposure from each was hazardous per se, and the presence of any instrument created a hazard, has acquiesced in the plaintiffs' claim. Ironically, the Court exhausted the subject with regard to a probable duty, as all motions testing this thesis were previously overruled. *See* Memorandum and Order, July 18, 1983, and February 24, 1984. Now, when the plaintiffs rested, the matter was again taken under advisement. Inasmuch as the Court has now found that the resultant doses were so small and did not contribute to or cause the plaintiffs' cancers, it probably makes little sense to further address any issue. Yet, the labeling issue remains as one for the United States to understand and deal with accordingly; certainly since the plaintiffs' cases are premised on this claim, i.e., failure to warn, they are deserving of the Court's views and findings.

While not addressed previously, considerable focus was given to the labeling requisites through the testimony of Dr. Morgan and principally from Dr. Gofman. (Gofman 1 & 2). Of all the various exhibits offered, discussed, and/or digested, the Court has been impressed with National Bureau of Standards Handbook 27 (Ex. 9489), entitled "Safe Handling of Radioactive Luminous Compound." It most clearly confirms that serious injury or even death may result from injudicious handling of the compound, and the hazards include ingestion or inhalation of solid radioactive luminous compound, inhalation of radon liberated from the compound into the air, and exposure of whole body to gamma radiation from the compound. It discusses procedures to avoid such exposure. Additionally, the Court notes Exhibit 10,700, a military standard having to do with markings and labeling. This standard was later modified to suggest that if the commodity emits its radiation in excess of .01 microcurie, it must be labeled. While there are some technical reasons as to why the plaintiffs' claims should fail, it will not suffice to decide this issue on technicalities. The Court will dispose of this, however, as follows.

Plaintiffs have urged through Military Standard MIL–M–19590C (Ex. 13,040 S) that as of April 30, 1963, the United States required manufacturers of new aircraft instruments with radium dials to place a label on them if they contained more than one microcurie of radium. Plaintiffs have also urged through Military Standards MIL–STD–1458 (Ex. 10,700) that as of December 11, 1972, the United States required manufacturers of new aircraft instruments with radium dials to place a label on them if they contained more than .01 microcurie of radium. Finally, plaintiffs have proven through DSAM 4145.8 (Ex. 9729) that as of November 1976, the United States required all branches of the military to label their instruments according to MIL–STD–1458 before disposing of them as surplus. However, these three documents do not prove that the United States had a duty to label radioactive instruments sold as surplus pri-

or to November 1976. Furthermore, they do not prove that the United States had a duty to label the very surplus instruments which found their way into AID because they could have been purchased by the United States prior to 1963 and sold as surplus prior to 1976.

■ Moreover, a military standard such as MIL–STD–1458 is, at best, a "safety code". The general rule is that such codes are not admissible in evidence. *Swaney v. Peden Steel Co.*, 259 N.C. 531, 131 S.E.2d 601, 608 (1963); *Mississippi Power & Light Co. v. Whitescarver*, 68 F.2d 928 (5th Cir. 1934). If admitted, they cannot be accepted "as an absolute standard nor as scientific truth, but will ... [be considered] as illustrative and explanatory material along with other evidence in the case bearing on the question of ordinary care." *Quinz v. U.S.*, 312 F.Supp. 999, 1005 (D.Ark.1970), *Aff'd,* 439 F.2d 335 (8th Cir.1971). Kansas does not adopt MIL–STD–1458 in its statutes concerning the safe handling of radioactive substances. (K.S.A. 48–1601).

■ Now returning to the more substantive basis for decision, the Court has found as fact that the average radium dial aircraft instrument at AID contained 3.5 to 3.76 microcurie of radiation or less. (Dr. Auxier's Report, p. 11, table 1; Dr. Maletskos' Report, p. 4, table 1). These instruments actually range from a high of 10.2 microcurie to a low of .05 microcurie. Neither of the referred standards would require the labeling of each sample instrument if the Court chooses to adopt these specifications as the reasonable man's standard.

In order to understand how "dangerous" such levels really are, one can follow three approaches. First, one can determine whether these surplus instruments actually constitute a serious health hazard in the real world. If so, a reasonably prudent person would be expected to label them. Second, one can determine whether similar items are labeled. If so, then a reasonable

person would be expected to label these items. Third, one can determine the real significance of these levels of radiation in comparison with the amount of radium-226 naturally present in nature.

Using the first approach, this Court has found that these unlabeled instruments at AID did not create significant doses to these plaintiffs and did not cause cancer in these four specific cases. Moreover, researches who have studied this problem in similar plants have concluded that "no major health problem is involved" (Ex. 9541), and that "work under these conditions has not resulted in excessive internal exposure." (Ex. 9507, p. 16). Consequently, when this Court examines the use of these instruments in the real world, this Court does not find that a reasonably prudent person should be required to label the instruments. In other words, a singular radioactive instrument will not, in and of itself, give rise to injury to anyone. This is not to say that storage, or an accumulation of instruments, in an unventilated, closed environment will not, in time, create a hazardous environment.[9]

Using the second approach, this Court examines how similar items are handled. Plaintiffs have, by example, produced no evidence that commercial airline or private airplane manufacturers or manufacturers of aircraft instruments with radium routinely labeled these instruments during the time frame in question. Moreover, defendant has shown that other consumer products such as wristwatches, pocket watches, and clocks containing similar amounts of radium were never, and are not today, labeled as a routine practice. (NCRP 56, pp. 19–24); T.Tr.Vol. 39, pp. 3060–3071; Vol. 40, pp. 3193–3194; Vol. 41, pp. 3267–3268; Vol. 63, pp. 5045, 5049–5054). Consequently, this Court finds no established practice to label these types of consumer products which should be imposed upon the United States.

---

**9.** The Court would equate such an event to that described by the uranium miners study. Those people worked in closed caverns, and after 10 years or so some could attribute lung cancer to the exposure from the build up of radon gas.

Using the third approach, this Court examines what these levels really mean in comparison to radium found in nature. Plaintiffs have avoided any comparison to natural radium by which this Court could understand what is really on those aircraft dials. Fortunately, defendant has provided ample helpful evidence on this point. For example, every year a model coal-fired electrical generating plant releases enough radium from its smokestack to make 200,000 average aircraft dials. (NCRP 77, p. 18; T.Tr.Vol. 41, pp. 3258–3260). This smoke is not labeled. Every year Florida exports enough unlabeled radium-226 in fertilizer to make 300,000,000 aircraft instrument dials. (T.Tr.Vol. 41, p. 3239). If this Court accepted MIL–STD–1458 (label at .01 microcurie) as the reasonable person standard, then every 10 pounds of standard Kansas wheat farm fertilizer would have to be labeled because it contains that much radium. (T.Tr. Vol. 41, pp. 3240–3241). There is enough radium in every five pick-up loads of Kansas dirt to make one average aircraft instrument dial. (NCRP 77, p. 23; T.Tr.Vol. 41, pp. 3263–3264). If this Court accepted MIL–STD–1458 (label at .01 microcurie) as the reasonable person standard, then a reasonable person in Kansas would have a tort duty to label every bucketful of dirt he owned. (T.Tr.Vol. 41, p. 3264). One public water supply in Kansas has enough radium in it to make one aircraft instrument dial from every 200,000 gallons of water. (NCRP 77, p. 49; T.Tr. Vol. 41, pp. 3265–3266). If this Court were to accept MIL–STD–1458 (label at .01 microcurie) as the reasonable person standard, then that Kansas town would be required to label every 600 gallons of public water. (T.Tr.Vol. 41, p. 3267). If the standard of labeling everything containing .01 microcurie of radium were applied to public water supplies in Minnesota, one city would have to label every 125 gallons of city water. (T.Tr.Vol. 41, p. 3267). Consequently, this Court finds that the amounts of radium on average aircraft instrument dials are so low compared to amounts found naturally that any tort standard to label such amounts would not only be silly, it would be impractical.

All three of these approaches to understand how "dangerous" the amounts of radium on these instruments really are compel the Court to only one conclusion. The United States can label anything it wants, but this Court will not turn its internal standards into an external tort duty standard owed to the public. In a court of law, a reasonable person is a reasonable person. The military will not be held to a higher standard in its duty to the public just because it enacted some other internal standard. Consequently, this Court holds that plaintiffs have failed to prove that the United States had a duty to label the instruments involved in these cases.

This is not a harsh result. There is no evidence that unlabeled radioactive aircraft instruments ever harmed a single person. Moreover, none of the researchers who studied this problem in depth ever recommended that a system of labeling should either be adopted or that it would successfully solve the contamination problems in this industry. Finally, the United States did warn the industry through numerous avenues. First, notice was given at the time of sale that some items may be radioactive. Second, the National Bureau of Standards published H–27 as a public service. Third, the National Bureau of Standards conducted a nationwide radon gas testing program in this industry. Fourth, the United States Public Health Service conducted an extensive study in Wichita plants, including AID. Fifth, the FAA published circulars on the subject. Sixth, and foremost, Kansas is an agreement state. (Taras, T.Tr.Vol. 20, pp. 1707–1713). It is the intention of Congress that the states are responsible for the regulation and control of the use of radioactive material within the state, and this would include a plant such as AID. AID is a licensed operator. The evidence shows that these products are not shipped in mass quantities, but rather, they are shipped from time to time in quantities of only a few. In each event, they have been ordered by the plant and their receipt is anticipated. The boxes contain

labeling to the effect that the products are radioactive. A radioactive instrument may be readily identified simply from its appearance. Typically, as the products are received, they are inventoried and identified, and those radioactive parts are set over for stripping, i.e., removal of the paint, or stored in a controlled area. At AID, a notice was posted at the door to the effect that the room contained radioactive material.

When the Court overruled the several motions testing this issue, it also commented that it appeared that the ultimate safety of an employee is dependent upon the cooperation of all parties in concert with the use, shipment, receipt and control of these products. In this light, it may make some sense to identify which product is radioactive and which is not, but under the evidence as the Court perceives it, in this rather limited field, controlled by the state, and ostensibly understood by the licensee, all of these requisites are understood and practiced. So it is that while labeling for this purpose may be of interest and assistance, the Court does not deem it necessary in the interest of identifying the instrument itself.

In the final analysis, it would seem that a decision as to the future positions or policies of the United States is for it to decide. This Court holds that the failure to label the instruments is not negligence per se, nor is it the violation of any standard.

### XIV. *Discretionary Functions and Immunity of the United States*

As stated at the outset, the Court has already ruled that the United States is immune in these cases for having elected to use or deal with radioactive aircraft instruments. To clarify the Court's view and findings, the following is submitted:

■ The United States is not subject to suit unless it has consented to be sued. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). Moreover, the United States may define the terms and conclusions upon which it may be sued. *Honda v. Clark*, 386 U.S. 484, 501 (1967); *United States v. Sherwood*,

*supra.* The Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680, upon which this Court's jurisdiction over the United States in the subject actions is predicated, is a limited waiver of the government's sovereign immunity, subject to certain enumerated jurisdictional prerequisites and exceptions. Chief among these exceptions is the discretionary function exception, 28 U.S.C. § 2680(a), which provides that the FTCA does not apply to any claim:

> based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the dicretion involved be abused.

The United States Supreme Court has examined the discretionary function exception in detail in two decisions. In *Dalehite v. United States,* 346 U.S. 15, 28, 73 S.Ct. 956, 964, 97 L.Ed. 1427 (1953), the Supreme Court held that the discretionary function exception barred a series of suits against the United States resulting from the disastrous explosion of ammonium nitrate fertilizer which had been produced and distributed according to the specifications and under the control of the United States. The fertilizer contained a coating subject to oxidation, was bagged in easily ignitable paper containers at a high temperature, and, as labeled, did not contain a warning of potential hazards. The Supreme Court concluded that the discretionary function exception prohibited claims based upon (1) the initial decision to institute the fertilizer export program; (2) the failure to conduct further experimentation with the fertilizer to determine the possibility of explosion; (3) the adoption of the basic plan of manufacture, including the decisions regarding the coating, bagging temperature, bagging materials, and labeling; and (4) the failure to police properly the storage and loading of the fertilizer. 346 U.S. at 37–44, 73 S.Ct. at 969–972. Although the Court found it "unnecessary to define, apart from this case, precisely where discretion ends," it nevertheless stated that the exception "includes more than the initiation of pro-

grams and activities." 346 U.S. at 35, 73 S.Ct. at 968. Rather, "[w]here there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." 346 U.S. at 36, 73 S.Ct. at 968.

Recently, the Supreme Court decided *United States v. Varig Airlines*, — U.S. ——, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). *Varig* reaffirmed *Dalehite's* interpretation of the discretionary function exception. *Varig* involved two Federal Tort Claims Act actions in which the United States was sued for the negligent inspection (or failure to inspect) of aircraft by the Federal Aviation Administration (FAA) and its predecessor agencies, which allegedly resulted in the crashes of the two planes. The FAA and its predecessors had utilized a spot checking program which relied upon compliance and checking by the manufacturers. In a unanimous opinion, the Supreme Court rejected the planning level/operational level line of cases adopted by various courts, and made clear that it was the nature of the discretion exercised, not the status of the employee, which was controlling. — U.S. at ——, 104 S.Ct. at 2764. The Supreme Court further stated that "whatever else the discretionary function exception may include, it plainly was intended to encompass discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." *Id.* Thus, the Supreme Court held that notwithstanding the duties of the FAA with respect to the inspection and certification of aircraft, implementation of the FAA's system for ensuring compliance with safety requirements, regardless of the level at which exercised, constituted discretionary decision-making within the purview of the discretionary function exception. The basic theory behind the FAA's enforcement of air safety standards—that the responsibility for satisfying FAA safety regulations rests with the aircraft industry, not with the FAA—was upheld by the Supreme Court as protected by the exception:

When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind.

— U.S. at ——, 104 S.Ct. at 2768.

This Court finds that the *Dalehite* and *Varig* decisions, as well as Tenth Circuit decisions interpreting the discretionary function exception, mandate this Court's conclusion that the United States' decisions to engage in the use of radioactive dials were discretionary.

The remaining and obvious issue is whether the failure to label, even if actionable, is also immune under the discretionary clause. As noted, the Court has taken this question under advisement. For all the reasons heretofore stated, disposition of this issue is an unnecessary exercise inasmuch as in the Court's view no labeling was required under the circumstances, nor did exposure to these instruments give rise to the plaintiffs' injuries. Inasmuch as the United States has persisted with its claim, it is deserving to note that in this Court's view, should such instruments have been shown to be dangerous per se, this Court retains its view that the findings in *Miller, supra,* should control a decision here. In this Court's view, in such an event, the use of such allegedly dangerous instrumentalities is operational rather than what is considered planning failures. As now found, more than once, this is just *not* such a case.

IT IS THEREFORE ORDERED this 15 day of November, 1984, that the foregoing findings of fact and conclusions of law are entered consistent with F.R.Civ.P. 52. Accordingly, the Court now having found fully in favor of defendant United States and against the plaintiffs, and each of them, these cases are dismissed with prejudice, and costs are assessed against the plaintiffs.